234 Kan. 957 (1984)
678 P.2d 153
FRED STOLDT, Appellant,
v.
CITY OF TORONTO, KANSAS, et al., Appellees.
No. 55,551
Supreme Court of Kansas.
Opinion filed February 18, 1984.
David H.M. Gray, of Gragert, Hiebert & Gray, of Wichita, argued the cause and was on the brief for the appellant.
*958 Dale L. Pohl, of Forbes & Pohl, of Eureka, argued the cause and was on the brief for appellees City of Toronto, Kansas, Jim Snavely, and Bill Gulick.
Patrick L. Dougherty, of Wichita, argued the cause and was on the brief for appellee Dalene Krkosska.
The opinion of the court was delivered by
HERD, J.:
This is an action by appellant Fred Stoldt against the appellees City of Toronto and certain city council members arising from the firing of Stoldt as Toronto night watchman. Appellant sought damages alleging appellees breached the Open Meetings Act, violated his civil rights, and engaged in a civil conspiracy. Appellant also sought reinstatement as night watchman. The trial court granted summary judgment for appellees and this appeal followed.
The appellee, City of Toronto, is incorporated under the laws of the State of Kansas as a third class city in Woodson County. It has a population of 470 and operates under the mayor-council form of government pursuant to K.S.A. 15-124. The individual appellees were members of the city council.
Stoldt started working part-time on a temporary basis as night watchman for the city of Toronto in July, 1981. He continued in that capacity until August 20, 1981. At the city council meeting on August 20, 1981, with Mayor Charles Davis presiding and council members Bud Moore, Jim Snavely, Bill Gulick and Ed Dyer present, Fred Stoldt was employed as official night watchman. There was no discussion between Stoldt and the city concerning the length or duration of his employment. Nor was there a contract or a local ordinance governing length of employment.
The job progressed smoothly for night watchman Stoldt for the first three and one-half weeks, then the peaceful village of Toronto was transformed. While making his rounds at 10:00 p.m. one night in September, 1981, Stoldt came upon a vehicle parked upon the sidewalk in front of a tavern. He dutifully issued a ticket for the traffic violation of illegal parking. At the time the identity of the violator was unknown. Very soon, however, the parking violator made himself known to the night watchman. Gary Tyner and Clyde Boone were standing close by on the sidewalk drinking beer when the ticket was issued. Tyner was the driver of the car. The two men approached Stoldt in a threatening manner and advised him he should not ticket cars so *959 parked. Stoldt ignored them and went on his way to watch for speeders coming through town on the highway. Tyner and Boone followed and started harassing Stoldt. He drove away to avoid a confrontation and patrolled other areas of the town. The two bullies followed. They next advised Stoldt if he did not destroy the ticket there would be one less patrol officer in town. They were apparently threatening to run him out of town rather than threatening his life.
Stoldt drove away, again attempting to avoid an unpleasant altercation. But the local roughnecks persisted. They had now picked up an additional recruit, one Kenny Robinson. They got into their vehicles and followed Stoldt. He drove out north of town and when he started to turn around and return, the culprits placed their vehicles in front and at the sides of the Stoldt car, boxing him in. They ordered him to take care of the ticket or they would beat him up and run him out of town. Stoldt then attempted to contact the sheriff at Yates Center by radio to obtain assistance but his radio message did not reach the sheriff's office. Under the coercion of the threats and the presence of the three bullies, Officer Stoldt tore up the ticket as the better part of valor and discretion.
By the time appellant got back to town, after tearing up the ticket, there was another car illegally parked on the sidewalk. It belonged to Kenny Robinson. Mitch Black then began riding his motorcycle through town at a high speed. Stoldt tried to stop the cycle, but could not because of the disparity in speeds.
By this time Mayor Davis had arrived on the scene in response to some phone calls he had received. Mitch Black had now left town on his motorcycle and the other people were seated in front of the tavern. The mayor talked to them and the trouble subsided for that evening.
At some time during that same evening, the sequence of which is not clear from the testimony, Tyner and Boone, in separate vehicles, caught Stoldt stopped at an intersection stop sign. Boone placed his vehicle in front of the officer's and Tyner stopped at the side, again boxing him in for a brief time in a harassing, intimidating manner.
The next day Officer Stoldt went to Yates Center and filed charges against Tyner, Boone and Black. He did not file against Robinson because his participation was brief.
*960 After the filing of the charges the three alleged violators again threatened Stoldt and his family. Stoldt made the mayor and two of the council members aware of all that had occurred.
September 17, 1981, was the next regular meeting of the city council. Dalene Krkosska, who was absent at the August 20 meeting when appellant was hired, was present at this meeting. During the meeting Krkosska moved the appellant be dismissed as night watchman. The motion was quickly seconded by Bill Gulick. There was no discussion. The mayor called for the vote. Voting in favor of the motion to dismiss were Dalene Krkosska, Bill Gulick and Jim Snavely. Bud Moore voted in opposition to the motion. After the vote the Mayor inquired as to the reason for the action. Dalene Krkosska indicated no reason was necessary and the action was taken without cause. It should be noted Clyde Boone, one of the perpetrators of the incident, is an employee of the city. Shortly thereafter he was given a raise.
Later, in deposition, each appellee was asked when and why they decided to fire Stoldt. Snavely stated he decided to fire appellant the night he was watching the disturbance with Clyde Boone. Gulick stated his primary reason for voting to fire appellant was because appellant had torn up the ticket he had issued to Clyde Boone. He maintained this position even though he knew appellant had refiled the ticket the next day. Appellee Krkosska stated she decided to fire appellant two or three days after the disturbance with Boone and Tyner and after discussing the prospect of hiring Leonard Elling as city marshal. Krkosska believed the appellant needed to be replaced by someone with law enforcement experience, such as Mr. Elling. Prior to the meeting of September 17, Krkosska had been introduced to Elling by her husband. Krkosska had invited Elling to attend the meeting in order to introduce him to the other council members.
It was true Stoldt had no previous experience in law enforcement. After high school he served in the Navy where he did six months shore patrol duty. Upon discharge from the Navy, appellant went into construction work. He quit his construction position in March, 1980, and moved to Toronto. In Toronto, he commenced operation of "Ready Freddie's" bait shop in December, 1980. He is still the owner of that business, although he stated his business was temporarily shut down because there was not enough business to keep it open. He continued to work *961 in the bait business throughout the entire time he worked for the city of Toronto. In October, 1981, he closed down the bait shop and moved to Madison, Kansas, where he had obtained employment as an oil field pipe tester. He is presently employed there.
Between September 17, 1981, when he was terminated and the date in October when he found permanent employment as a pipe tester, appellant had part-time employment as a mechanic in Yates Center.
Prior to the filing of this action appellant talked to none of the council members about why he had been dismissed and requested no due process hearing.
The council made a clean sweep of city law enforcement people at the September 17 meeting. Thomas Wilson, who served as Toronto city attorney, as well as Woodson County attorney, was also discharged at the meeting. Wilson had been in charge of prosecuting Clyde Boone, Gary Tyner and Mitch Black. The appellees testified Mr. Wilson was discharged as city attorney because the city could not afford his fees and they saw little benefit in his consultations. The appellant testified he believed Mr. Wilson was fired for prosecuting Clyde Boone, since he was a city employee and a social acquaintance of the council members.
Attorney Wilson was working for the city under an employment agreement which permitted either party to terminate his employment upon two days' notice. An affidavit filed by Wilson indicated he had no personal information concerning the manner or reasons for termination of appellant and further that he had no information which would indicate there was any relationship between appellant's termination and the filing of criminal charges involving city employee Clyde Boone.
It is interesting to note that at 7:15 p.m. on September 17, 1981, prior to the 7:30 p.m. council meeting the vehicles commonly operated by Krkosska and Gulick were observed parked outside the home of Snavely by Claude Burr while on his way to the council meeting.
Although the general procedure at council meetings was for the mayor to have an agenda available for his use, it was not unusual for other council members to bring up items of business not on the agenda. At the September 17 meeting, however, Mayor Davis testified it appeared Krkosska had her own agenda *962 which the other two appellees appeared to follow. The mayor testified the votes of Krkosska, Gulick and Snavely appeared to have been prearranged.
Stoldt subsequently filed this action. The trial court granted judgment in favor of defendants. This appeal was then perfected.
Stoldt initially argues the trial court erred in ruling he lacked standing to allege a violation of the Kansas Open Meetings Act (KOMA), K.S.A. 75-4317 et seq. In sustaining the appellees' motion for summary judgment the trial court stated:
"K.S.A. 1981 Supp. 75-4320a, when read in conjunction with K.S.A. 75-4320 and 75-4317, makes it clear that the intent of the open meetings law is to preclude reoccurrences of violations that occur when the action is brought under K.S.A. 1981 Supp. 75-4320a. Nothing therein gave authority for a private individual to bring an action which voids any action taken at the meeting; that is particularly reserved to the Attorney General or County or District Attorney by the provisions of K.S.A. 75-4320a. Thus, the plaintiff could not have a cause of action for damages against the defendants under the open meetings law of the state of Kansas nor can he void the action taken at such a meeting by this suit for a violation of such law."
We hold this a correct statement of the law. The Kansas appellate courts have permitted private entities to raise the issue of open meetings violations. See Olathe Hospital Foundation, Inc. v. Extendicare, Inc., 217 Kan. 546, 539 P.2d 1 (1975), and Coggins v. Public Employee Relations Board, 2 Kan. App.2d 416, 581 P.2d 817, rev. denied 225 Kan. 843 (1978). In neither of those cases, however, was the issue of a private party's standing to bring the suit discussed.
KOMA, while authorizing suits brought by the attorney general, county and district attorneys for violations, does not preclude private party actions. The policy of the act as stated in K.S.A. 75-4317 also supports members of the general public having standing to sue thereunder.
Many other states which provide civil sanctions for open meetings violations, as does Kansas, allow private individuals to sue. See Ark. Stat. Ann. § 12-2806 (1979); Iowa Code Ann. § 28A.6 (West 1983 Supp.); Neb. Rev. Stat. § 84-1414(3) (1981).
KOMA provides for civil penalties up to $500 and voidance of binding actions taken during a meeting in violation of the act. However, these remedies are available only to the attorney general and county and district attorneys. KOMA also provides for injunctive and mandamus relief by the court to enforce the *963 act. See K.S.A. 75-4320(a). Standing to seek these remedies is not limited. We, therefore, conclude injunctive and mandamus relief is available to private parties as well as to public prosecutors.
In this case Officer Stoldt seeks voidance of the city council's action, reinstatement, and monetary damages. He does not seek an injunction or a writ of mandamus. While appellant has standing to raise the issue of violation of KOMA, none of the remedies he seeks is available to a private individual. Olathe and Coggins could be interpreted as authority for full-scale private party standing. However, in Olathe the court did not question a private party's right to seek voidance of governmental action based on a violation of KOMA. The court refused to void the action because the violation was a mere technicality. The issue of the private party's standing, therefore, was not reached. In Coggins, the action was returned to the governmental board due to procedural irregularities separate and apart from a possible KOMA violation. Thus, again we have voidance of governmental action sought by a private individual based on a KOMA violation and the case disposed of without the court reaching the issue of standing. We conclude neither of these cases is precedent for a private party having standing to void governmental action for a KOMA violation.
Rather, we construe KOMA to authorize no one other than the attorney general, district attorneys or county attorneys to seek voidance of governmental action based on violations of the act. It is with good reason the legislature would so restrict the act. Voidance of governmental action, be it administrative or legislative, is a drastic remedy. The threat of it would be very unsettling. The restriction on the remedy provides governmental stability. A private person who feels aggrieved must first convince a prosecutor of the merits of his cause within ten days of the KOMA violation and get the prosecutor to seek voidance to undo the governmental acts. See K.S.A. 75-4320(a). It would be most difficult for government to function if every person was vested with the remedy of voiding governmental action for a violation of KOMA. Such actions, even though possibly ultimately unsuccessful, would unreasonably tie up government. We hold an individual who seeks to enforce KOMA through private litigation has only the remedies of mandamus and injunction, both of which have prospective application.
*964 The appellant next argues the trial court erred in determining the appellees had not violated his civil rights and deprived him of due process. Due process requires, when liberty or property rights protected by the Fourteenth Amendment are involved, the right to a hearing prior to taking. See Board of Regents v. Roth, 408 U.S. 564, 569-70, 33 L.Ed.2d 548, 92 S.Ct. 2701 (1972). The appellant in the instant case claims he had a property right in the position of city night watchman; thus, when it was taken, he was entitled to a due process hearing prior to his termination.
The test for determining whether a property interest exists has been described by the United States Supreme Court in Roth as:
"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577.
In Roth, a teacher who had been hired for and completed a one-year term was informed he would not be rehired for another term. The United States Supreme Court held Roth had no property interest in the teaching position since state law did not grant him any job protection beyond the one-year contract term.
In Bishop v. Wood, 426 U.S. 341, 48 L.Ed.2d 684, 96 S.Ct. 2074 (1976), a city manager dismissed a police officer without a hearing to determine the sufficiency of the cause for discharge. In holding the police officer lacked a property interest in his position since there was no employment contract for a term of employment and no applicable statute, the United States Supreme Court held: "A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law." 426 U.S. at 344.
The Kansas Supreme Court has held only vested rights have a sufficient property interest to require due process protection. See Leek v. Theis, 217 Kan. 784, 539 P.2d 304 (1975). In Leek, this court held the tenure of any office not provided for in the constitution may be declared by statute, and when not so declared such office shall be held at the pleasure of the appointing authority. "Kansas law clearly establishes the incumbent to a public office enjoys no property or vested interest in public office." 217 Kan. at 811. The applicable Kansas state law in this case is K.S.A. 15-204, which provides:
"The mayor, with the consent of the council, may appoint ... a marshal-chief *965 of police, policemen ... and such other officers as deemed necessary.... A majority of all the members of the council may remove any such officer; or, for good cause, the mayor may remove any such officer, with the consent of the council."
This statute does not provide for any term of office. It additionally allows a mere majority of the members of the city council to remove any such officer at will. There is no requirement that the council have or give cause for the termination. The appellant in this case had no constitutionally protected property right in his position as night watchman.
The appellant next argues his dismissal violated his liberty interest. In Roth, the United States Supreme Court held there could be no violation of any liberty interest where no reason was stated or given for the non-rehiring since there could be no impairment of the employee's "`good name, reputation, honor, or integrity....'" 408 U.S. at 573. The court emphasized the failure to rehire without cause did not foreclose the employee's freedom to take advantage of other employment opportunities. In Weathers v. West Yuma County School Dist. R-J-1, 530 F.2d 1335, 1339 (10th Cir.1976), the court stated:
"[F]or a liberty interest to be present ... for failure to reemploy had to impose on the employee `a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.'"
Appellant in this case attempts to establish he was so stigmatized by the termination that it ruined his family-owned business and made it difficult for him to seek other employment. Appellant, however, admits that within two weeks of termination he found part-time employment and within a month he had obtained permanent employment in a town twenty miles from the city of Toronto. Appellant further testified he was never rejected for any job after his termination and he had no knowledge of any job being denied him because of the termination. Appellant has not met the Roth test of being so severely stigmatized as to be denied his constitutional right to liberty.
Appellant next argues his liberty interest was also violated because of threats to his personal safety. However, there is no evidence in the record to show appellant's personal safety was jeopardized because of his dismissal. Further, appellant testified none of the appellees were party to any threats nor did appellant *966 ever advise the appellees of any such threats by anyone else. This argument is without merit.
Appellant finally argues his liberty interest was violated because he was fired for exercising a constitutionally protected right. Appellant cites Perry v. Sindermann, 408 U.S. 593, 33 L.Ed.2d 570, 92 S.Ct. 2694 (1972), to support this contention. In Perry, it was held the failure to renew a professor's contract, even in the absence of any protected property interest, required the protection of due process if the failure to renew was because the professor exercised the right to free speech. Here, the appellant argues the right he exercised was his right to avail himself of access to the courts. The courts have recognized this as a constitutionally protected right. See 1 Antieau, Federal Civil Rights Acts: Civil Practice § 134 (2d ed. 1980). The violation allegedly occurred because the appellant believes he was terminated as night watchman due to filing criminal charges against Clyde Boone. The evidence appellant cites in support of this argument is that the appellees were friends of Clyde Boone, the lack of stated cause for appellant's termination, and the firing of the city attorney who also prosecuted Clyde Boone. The appellees note, however, none of them interfered with the filing of the charges and they all thought the actions of Boone warranted legal action by the night watchman. The city attorney filed an affidavit in this case stating he knows of no connection between his firing and appellant's. The record does not indicate there is any question of material fact that appellant was terminated merely because he exercised a constitutional right.
Appellant also argues the action of the appellees was unconstitutionally arbitrary and capricious. For support appellant cites McGhee v. Draper, 564 F.2d 902 (10th Cir.1977). This case is easily distinguished. The McGhee court held a person with a property or liberty interest in public employment may not be terminated in an arbitrary or capricious manner without a due process hearing. In the instant case appellant had neither a property nor a liberty interest in his position. Appellees are entitled both constitutionally and statutorily to act without cause or hearing.
Appellant's final argument is that the appellees, council members, committed a civil conspiracy. Kansas recognizes civil conspiracy as an actionable tort. See Citizens State Bank v. Gilmore, 226 Kan. 662, 603 P.2d 605 (1979). In Gilmore, we *967 stated the elements of a civil conspiracy include: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." 226 Kan. 662, Syl. ¶ 7. Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy. In this case, the potential wrongs upon which the conspiracy could be predicated are a violation of appellant's civil rights or a breach of the open meetings act. The civil rights violation was eliminated in our foregoing discussion. Let us then examine the open meetings issue as it might pertain to conspiracy. The trial court found facts to support a violation of the open meetings law but determined since appellant sought damages and reinstatement, which are not remedies recoverable by private parties in a KOMA action, rather than injunction or mandamus, which are recoverable, the civil conspiracy was not supported by the open meetings violation. This leaves the civil conspiracy count dependent upon the existence of a remedy for the alleged open meetings violation. Proof of a KOMA violation will support a cause of action for civil conspiracy, regardless of recovery, if the violation produces an unlawful result. In the instant case, the termination of appellant's employment (the result) was lawful; only the means was unlawful. Except for a statement from one case, Railway Co. v. Brown, 80 Kan. 312, 102 Pac. 459 (1909), to the effect that a civil conspiracy may occur when there are "unlawful means" to an end which is lawful, we have consistently held conspiracy turns on an illegal result rather than the means. See May v. Santa Fe Trail Transportation Co., 189 Kan. 419, 370 P.2d 390 (1962) (no civil conspiracy could exist to discharge plaintiff from his employment since the resulting discharge did not constitute a breach of the employment contract); Citizens State Bank v. Gilmore, 226 Kan. 662 (civil conspiracy existed where defendants conspired to sell diseased cattle in violation of Kansas statutes); Knight v. Neodesha Police Dept., 5 Kan. App.2d 472, 620 P.2d 837 (1980) (civil conspiracy was actionable if plaintiff could prove the result of the conspiracy was an actionable tort).
We hold an action for civil conspiracy must be supported, as one of its elements, by one or more unlawful, overt acts which *968 produce an unlawful result. Thus, appellant's cause of action for civil conspiracy will not lie.
The judgment of the trial court is affirmed.