No. 57,802

FRANK PADILLA, *Appellee*, v. CITY OF TOPEKA, *Appellant*.

(708 P.2d 543)

Opinion filed October 25, 1985.

*Richard E. Jones*, deputy city attorney, argued the cause and was on the brief for appellant.

*Gary H. Hanson*, of Stumbo & Stumbo, of Topeka, argued the cause and was on the brief for appellee.

*Brandon L. Myers*, staff attorney, was on the *amicus curiae* brief for the Kansas Commission on Civil Rights.

The opinion of the court was delivered by

McFARLAND, J.: Plaintiff Frank Padilla brings this action against defendant City of Topeka alleging the City wrongfully refused to hire him as a Topeka police officer. Mr. Padilla was not hired because his uncorrected vision was below the standards for new recruits set by the Topeka Police Department. Plaintiff contends the City's refusal to hire him violated: (1) his constitutional rights to due process and equal protection; and (2) federal, state and municipal laws relative to the hiring of handicapped persons. The trial court generally held favorably to the plaintiff on all points, invalidated the visual acuity requirement, ordered the plaintiff be considered a qualified applicant, and allowed attorney fees to plaintiff. The defendant City appeals from all adverse determinations.

The facts of the case are mainly uncontroverted and may be summarized as follows. In 1979 plaintiff applied for the position of police officer with the City of Topeka. He passed all of the tests except the physical standard for uncorrected visual acuity which required no less than 20/50 for each eye.

Minimum physical standards for new Topeka police officers and firefighters were developed in 1978 by Dr. Ray D. Baker, a physician, who is the director of the Topeka-Shawnee County Health Department. In formulating the Topeka standards, Dr. Baker studied the standards utilized by several major police and highway patrol departments outside of the State of Kansas. Additionally, Dr. Baker conferred with the Topeka Police Chief as to the type of adverse working conditions police officers could encounter. The visual acuity standard recommended by Dr. Baker and adopted by the Topeka Fire and Police Civil Service Commission required not less than 20/50 uncorrected vision in each eye—correctable to 20/20 in each eye.

Plaintiff was working as a corporal with the Ottawa (Kansas) Department of Public Safety at all times relevant. He wears

glasses which correct his vision to 20/20. His myopia has not caused him any difficulty in any aspect of his life, including his police position in Ottawa. He does not believe his myopia limits or restricts his activities in any way. Plaintiff's eyes test 20/100 in the left eye, 20/70 in the right eye, and 20/50 binocular (both eyes functioning as opposed to monocular testing). By virtue of the nature of the monocular and binocular testing, it would seem illogical that the binocular test figure could be better than the vision in a single eye, but such was the evidence and we must accept it as correct.

At trial of the action herein, plaintiff testified and called as his only witnesses two fellow officers from Ottawa who testified plaintiff had satisfactorily performed all of his duties in Ottawa. Defendant City called Dr. Baker, who testified as to how the study of physical standards for police officers was developed, and Robert Weinkauf, Topeka Chief of Police, who testified as to the extreme variety of potentially dangerous conditions which may confront a police officer and the need for good vision without reliance on removable vision corrective devices. Matthew B. Works, past secretary with the Topeka Fire and Police Civil Service Commission, testified as to the civil service board's adoption of standards for new Topeka police officers. Finally, Dr. James E. Sheedy, an optometrist and assistant professor at the University of California, School of Optometry, in Berkeley, testified as an expert on the need for standards for minimum uncorrected vision in police officers. He personally recommended more stringent standards than those before us. Dr. Sheedy, on cross-examination, testified that the new extended wear contact lenses might reduce some of the problems associated with glasses and regular contact lenses (being lost during scuffles, etc.). It was agreed some 55 Topeka officers on the force prior to adoption of the standards do not meet the visual acuity standards. However, it was also agreed no officers have been hired since adoption of the standards who did not meet the visual acuity standard.

The first issue is whether defendant deprived plaintiff of liberty or property without due process of law under the Fourteenth Amendment to the United States Constitution.

As stated in *Board of Regents v. Roth*, 408 U.S. 564, 33 L.Ed.2d 548, 92 S.Ct. 2701 (1972):

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577.

Additionally:

"It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." 408 U.S. at 575.

In *Stoldt v. City of Toronto,* 234 Kan. 957, 678 P.2d 153 (1984), we held that a night watchman fired by the City of Toronto had no property interest in his job either by statute or contract, and, hence, his termination did not violate his right to due process.

It follows, *a fortiori,* that there is no property interest in obtaining municipal employment; neither is a liberty interest affected.

We hold plaintiff's constitutional right to due process was not violated herein.

The second issue is whether defendant denied plaintiff equal protection of the law contrary to the Fourteenth Amendment to the United States Constitution.

Plaintiff was not hired by virtue of having failed the visual acuity standard. Is this a violation of his constitutional right to equal protection? We believe not. In analyzing denial of equal protection issues, the first matter of determination is whether the strict scrutiny standard or rational-basis standard is to be applied. *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 311-12, 49 L.Ed.2d 520, 96 S.Ct. 2562 (1976), involved an equal protection challenge to a Massachusetts law requiring retirement of highway patrol officers at age 50. In holding that the mandatory retirement provision did not violate the equal protection clause, the United States Supreme Court reasoned as follows:

"We need state only briefly our reasons for agreeing that strict scrutiny is not the proper test for determining whether the mandatory retirement provision denies appellee equal protection. *San Antonio School District v. Rodriguez,* 411. U.S. 1, 16 (1973), reaffirmed that equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class. Mandatory retirement at age 50 under the Massachusetts statute involves neither situation.

"This Court's decisions give no support to the proposition that a right of governmental employment *per se* is fundamental. See *San Antonio School District v. Rodriguez, supra; Lindsey v. Normet,* 405 U.S. 56, 73 (1972); *Dandridge v. Williams,* [397 U.S. 471], at 485. Accordingly, we have expressly stated

that a standard less than strict scrutiny 'has consistently been applied to state legislation restricting the availability of employment opportunities.' *Ibid.*

"Nor does the class of uniformed state police officers over 50 constitute a suspect class for purposes of equal protection analysis. *Rodriguez, supra,* at 28, observed that a suspect class is one 'saddled with such disabilities, or subject to such a history of purposeful unequal treatment or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.' While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike say, those who have been discriminated against on the basis of race or national origin, have not experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities. The class subject to the compulsory retirement feature of the Massachusetts statute consists of uniformed state police officers over the age of 50. It cannot be said to discriminate only against the elderly. Rather, it draws a line at a certain age in middle life. But even old age does not define a 'discrete and insular' group, *United States v. Carolene Products Co.,* 304 U.S. 144, 152-153, n. 4 (1938), in need of 'extraordinary protection from the majoritarian political process.' Instead, it marks a stage that each of us will reach if we live out our normal span. Even if the statute could be said to impose a penalty upon a class defined as the aged, it would not impose a distinction sufficiently akin to those classifications that we have found suspect to call for strict judicial scrutiny.

"Under the circumstances, it is unnecessary to subject the State's resolution of competing interests in this case to the degree of critical examination that our cases under the Equal Protection Clause recently have characterized as 'strict judicial scrutiny.'

"We turn then to examine this state classification under the rational-basis standard. This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. *Dandridge v. Williams, supra,* at 485. Such action by a legislature is presumed to be valid.

"In this case, the Massachusetts statute clearly meets the requirements of the Equal Protection Clause, for the State's classification rationally furthers the purpose identified by the State: Through mandatory retirement at age 50, the legislature seeks to protect the public by assuring physical preparedness of its uniformed police. Since physical ability generally declines with age, mandatory retirement at 50 serves to remove from police service those whose fitness for uniformed work presumptively has diminished with age. This clearly is rationally related to the State's objective. There is no indication that § 26(3)(a) has the effect of excluding from service so few officers who are in fact unqualified as to render age 50 a criterion wholly unrelated to the objective of the statute.

"That the State chooses not to determine fitness more precisely through individualized testing after age 50 is not to say that the objective of assuring physical fitness is not rationally furthered by a maximum-age limitation. It is only to say that with regard to the interest of all concerned, the State perhaps has not chosen the best means to accomplish this purpose. But where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the

classifications made by its laws are imperfect.' *Dandridge v. Williams*, 397 U.S., at 485." 427 U.S. at 312-16.

Obviously, visual acuity of its police officers is a reasonable concern of the City of Topeka. Police officers are not able to call a "time out" in emergencies while they look for their glasses or lost contact lenses. Their jobs often lead them into physical encounters with rowdy persons where such mishaps may occur. No one likes to contemplate a police officer trying to determine, before he fires, which of two blurry shapes is the felon and which is the hostage or a fellow officer. The visual acuity standard for new recruits was relatively new to the Topeka Police Department when this case arose. As a result, a number of officers already on the force could not meet it if called upon to do so. It would be poor public policy to hold that a police department cannot upgrade its officers by imposing standards without terminating all existing officers who could not meet the new standards. Vision seldom improves with age. Time and natural attrition should ultimately reduce the number of myopic officers on the force. The 55 officers not meeting the standard are not differentiated between near and farsighted individuals, so we do not know how many are myopic. Logically, farsightedness presents less of a problem for officers in emergency situations than does myopia.

Applying the appropriate rational-basis standard, we conclude the minimum visual acuity standard herein is rationally related to the City's' objective and plaintiff has not been denied equal protection of the laws.

The third issue is whether the trial court erred in holding the defendant City's failure to hire plaintiff was a violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 (1982) *et seq.*

29 U.S.C. § 794 (1982) prohibits discrimination against "otherwise qualified handicapped" individuals as defined in § 29 U.S.C. 706(7) (1982), which states:

"(A) Except as otherwise provided in subparagraph (B), the term 'handicapped individual' means any individual who (i) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (ii) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to subchapters I and III of this chapter.

"(B) Subject to the second sentence of this subparagraph, the term 'handicapped individual' means, for purposes of subchapters IV and V of this chapter,

any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. For purposes of sections 793 and 794 of this title as such sections relate to employment, such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others."

The threshold question is, of course, whether plaintiff was a handicapped person within the definition of the above statute. An illuminating case on this issue is *Jasany v. United States Postal Service*, 755 F.2d 1244 (6th Cir. 1985). Jasany was a postal worker who was hired to operate a mail sorting machine. He has a mild case of strabismus (crossed eyes) which had never previously limited any of his activities. However, the condition precluded work on the mail sorting machine. Jasany was terminated for inability to perform the work for which he was hired and brought this action alleging violation of the federal Rehabilitation Act of 1973. In denying relief under the Act, the Sixth Circuit reasoned:

"To assert a claim that he was discriminated against because of a physical handicap, Jasany must satisfy the threshold requirement that he is a handicapped person as defined by the statute. A handicapped person is one who 'has a physical or mental impairment which *substantially* limits one or more of such person's major life activities.' 29 U.S.C. § 706(7)(B)(i) (emphasis added). 'Major life activities' is defined in 29 C.F.R. § 1613.702(c) as 'functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working*' (emphasis added). The District Court reasoned that Jasany's strabismus impaired his ability to work on the LSM-ZMT, which qualified as a major life activity, and held that he was a handicapped person with the meaning of 29 U.S.C. § 706(7)(B). The appellees do not question that Jasany's strabismus qualifies as a 'physical or mental impairment.' They do, however, challenge the conclusion that Jasany's impairment meets the second part of the definition.

"In *E.E. Black, Ltd. v. Marshall*, 497 F.Supp. 1088 (D.Hawaii 1980), the court carefully considered the definition of a handicapped individual in 29 U.S.C. § 706(7). It concluded that an impairment that interfered with an individual's ability to do a particular job, but did not significantly decrease that individual's ability to obtain satisfactory employment otherwise, was not *substantially* limiting within the meaning of the statute. 497 F.Supp. at 1099-1100; *see also Salt Lake City Corp. v. Confer*, 674 P.2d 632, 636-37 (Utah 1983) ('*one particular job for one particular employer* cannot be a "major life activity"' (emphasis in original)) (interpreting identical language in state statute). The *Black* court suggested a number of factors relevant to determining whether an impairment substantially limited an individual's employment potential—the number and

type of jobs from which the impaired individual is disqualified, the geographical area to which the individual has reasonable access, and the individual's job expectations and training. 497 F.Supp. at 1100-01.

"*Black* was an appeal from an ALJ's determination that an individual, refused employment as an apprentice carpenter because of a congenital back anomaly, was not handicapped because his impairment did not affect his employability generally. Although the appellant was not functionally limited, the refusal of employment was based on the ground that his impairment made him more prone to injury. The ALJ had reasoned that focusing on particular fields rather than on employability in general would lead by way of illustration to the anomalous result that individuals too slow to play professional football or too short to play basketball would be able to surmount the initial burden of demonstrating that they were handicapped individuals in challenging their exclusion from those jobs. The *Black* court responded that the ALJ's concerns were misplaced, since those individuals would not be protected by the Act, not because their 'impairment' did not substantially limit their employability, but because they were not capable of performing the particular job in question and hence were not 'qualified handicapped individuals' within the meaning of 60 C.F.R. § 60-741.2. *Id.* at 1099-1100; *see also* 29 C.F.R. § 1613.702(f). The court concluded that the policy of the defendant employer must be ascribed all employers offering the same or similar jobs, and that the appellant's impairment constituted, *for him,* a substantial handicap to employment when the factors listed above were applied. *Id.* at 1102.

"*Black* represents the most comprehensive examination by a court to date of the § 706(7) definition of 'handicapped.' While we agree with the *Black* court's conclusion that in applying the definition, the impairment at issue must be evaluated with reference to the individual job seeker, that court did not adequately analyze the focus and relationship of the definitional elements of the statute—impairment, substantial limitation of a major life activity, and qualified person. *See generally* Haines, E.E. Black, Ltd. v. Marshall: *A Penetrating Interpretation of 'Handicapped Individual' for Sections 503 and 504 of the Rehabilitation Act of 1973 and for Various State Equal Employment Opportunity Statutes,* 16 Loy.L.A.L.Rev. 527 (1983) (discussing ambiguity of statutory definition of 'handicapped').

"The *Black* court was right in rejecting the ALJ's illustrations of people incapable of playing professional sports, but for the wrong reason. Characteristics such as average height or strength that render an individual incapable of performing particular jobs are not covered by the statute because they are not *impairments.* The distinction can be an important one. The burden is on the plaintiff to establish the existence of an impairment that substantially limits a major life activity as an element of the plaintiff's prima facie case. Once a prima facie case has been presented, the burden shifts to the defendant employer to demonstrate that challenged criteria are job related and required by business necessity, and that reasonable accommodation is not possible. *Prewitt v. United States Postal Service,* 662 F.2d 292, 306-08 (5th Cir. 1981). If the plaintiff fails to establish a prima facie case, it is unnecessary to address the question of reasonable accommodation.

"In the instant case, the parties stipulated that Jasany's condition had never

had any effect whatsoever on any of his activities, including his past work history and ability to carry out other duties at the post office apart from operation of the LSM-ZMT. Based upon this stipulation and in light of our analysis of the statutory definition, we find that the District Court erred as a matter of law in finding that the appellant was a handicapped person within the meaning of 29 U.S.C. § 706(7). Consequently, the appellant failed to establish a prima facie case of handicap discrimination." 755 F.2d at 1248-50.

The whole thrust of plaintiff's evidence in the case before us was that he was not a handicapped person. He (and fellow officers) testified he was able to perform his duties as an Ottawa safety officer (encompassing police and fire department duties). With corrective lenses, plaintiff's vision is 20/20. Plaintiff has worn glasses since his grade school days and testified to no problems or limitations in his activities. The rationale expressed in *Jasany* is applicable to the case before us. Plaintiff has a visual impairment, but he has failed to meet the threshold requirement that he is a handicapped person within the definition contained in 29 U.S.C. § 706(7)(B)(i). There is simply no evidence plaintiff has a "physical or mental impairment which substantially limits one or more of such person's major life activities." The trial court erred in holding the Rehabilitation Act was applicable herein and in holding plaintiff has been discriminated against under said Act.

The fourth issue is whether the trial court erred in holding the defendant City's failure to hire plaintiff was a violation of the Kansas Act Against Discrimination, K.S.A. 44-1001 *et seq.*

The pertinent statutory provisions are as follows:

"44-1001. **Title of act; declaration of state policy and purpose.** This act shall be known as the Kansas act against discrimination. It shall be deemed an exercise of the police power of the state for the protection of the public welfare, safety, health and peace of the people of this state. The practice or policy of discrimination against individuals in employment relations, in relation to free and public accommodations or in housing by reason of race, religion, color, sex, physical handicap, national origin or ancestry is a matter of concern to the state, since such discrimination threatens not only the rights and privileges of the inhabitants of the state of Kansas but menaces the institutions and foundations of a free democratic state. It is hereby declared to be the policy of the state of Kansas to eliminate and prevent discrimination in all employment relations, to eliminate and prevent discrimination, segregation, or separation in all places of public accommodations covered by this act, and to eliminate and prevent discrimination, segregation or separation in housing.

"It is also declared to be the policy of this state to assure equal opportunities and encouragement to every citizen regardless of race, religion, color, sex, physical handicap, national origin or ancestry, in securing and holding, without

discrimination, employment in any field of work or labor for which he is properly qualified, to assure equal opportunities to all persons within this state to full and equal public accommodations, and to assure equal opportunities in housing without distinction on account of race, religion, color, sex, physical handicap, national origin or ancestry. It is further declared that the opportunity to secure and to hold employment, the opportunity for full and equal public accommodations as covered by this act and the opportunity for full and equal housing are civil rights of every citizen.

"To protect these rights, it is hereby declared to be the purpose of this act to establish and to provide a state commission having power to eliminate and prevent segregation and discrimination, or separation in employment, in all places of public accommodations covered by this act, and in housing because of race, religion, color, sex, physical handicap, national origin or ancestry, either by employers, labor organizations, employment agencies, realtors, financial institutions or other persons as hereinafter provided.

"44-1002. **Definitions.** When used in this act:

. . . .

"(j) The term 'physical handicap' means the physical condition of a person, whether congenital or acquired by accident, injury or disease which constitutes a substantial disability, but is unrelated to such person's ability to engage in a particular job or occupation.

. . . .

"44-1006. **Construction of act.** The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof. Nothing contained in this act shall be deemed to repeal any of the provisions of any other law of this state relating to discrimination because of race, religion, color, sex, physical handicap, national origin or ancestry, unless the same is specifically repealed by this act. Nothing in the Kansas act against discrimination shall be construed to require the construction of any special facilities or fixtures for the physically handicapped. Nothing in this act shall be construed to mean that an employer shall be forced to hire unqualified or incompetent personnel, or discharge qualified or competent personnel.

. . . .

"44-1009. **Unlawful practices; unlawful discriminatory practices.** (a) It shall be an unlawful employment practice:

"(1) For an employer, because of the race, religion, color, sex, physical handicap, national origin or ancestry of any person to refuse to hire or employ, or to bar or to discharge from employment such person or to otherwise discriminate against such person in compensation or in terms, conditions, or privileges of employment; or to limit, segregate, separate, classify or make any distinction in regards to employees; or to follow any employment procedure or practice which, in fact, results in discrimination, segregation or separation without a valid business motive."

As in the federal Rehabilitation Act of 1973, previously discussed, where a person is claiming discrimination under K.S.A. 44-1001 *et seq.*, on the basis of being physically handicapped, he must satisfy the threshold requirement that he is a person with a physical handicap as defined by K.S.A. 44-1002(j).

Although phrased differently in the federal and state legislation, the basic concept is similar. A physical impairment does not automatically equate to a handicap under either act—less than perfect is not the definition of handicap under either statute. The handicap must be a substantial disability unrelated to the ability to engage in the particular job or activity (K.S.A. 44-1002[j]) or a physical impairment which substantially limits one or more of such person's major life activities. 29 U.S.C. § 706(7)(B)(i).

Myopia corrected to 20/20 vision by means of corrective lenses is not a substantial disability within the definition of physical handicap contained in K.S.A. 44-1002(j). Here again, it should be noted there was no evidence plaintiff's myopia had ever limited or restricted his activities. Indeed, plaintiff introduced testimony of his ability to perform the Ottawa Public Safety Officer duties. Plaintiff's evidence, in fact, was intended to establish that his physical impairment did not constitute a handicap.

We conclude the trial court erred in holding plaintiff had a physical handicap as defined by K.S.A. 44-1002(j) and that the defendant City violated the Kansas Act Against Discrimination (K.S.A. 44-1001 *et seq.*) in failing to hire plaintiff as a police officer.

The fifth issue is whether the trial court erred in holding the defendant City's failure to hire plaintiff was in violation of the Code of the City of Topeka § 22-99 (1985).

The ordinance provides:

"It shall be an unlawful employment practice for an official, department head, agent or employee of the city, because of . . . physical handicap, which is unrelated to the ability to perform a particular [task] or occupation . . . to refuse to hire or employ, or to bar or to discharge from employment such person or to otherwise discriminate against such person . . . without a valid business motive."

"Physical handicap" is not defined in the ordinance. The parties agree that the term should be construed and interpreted similarly to the term "handicapped person" as defined in the federal Rehabilitation Act of 1973 (they disagree on what the correct interpretation of the federal statute is). We have, in deciding an earlier issue in this opinion, held that plaintiff's visual impairment correctable by glasses or contact lenses does not constitute a physical handicap within the meaning of 29 U.S.C. § 706 (7)(B)(i). We see no valid basis for interpreting the

term "physical handicap" in the ordinance to be broader in scope than the definition thereof in 29 U.S.C. § 706(7)(B)(i) or in K.S.A. 44-1002(j).

We conclude plaintiff did not have a physical handicap within the scope of the Code of the City of Topeka § 22-99, and the trial court erred in holding otherwise.

The final issue is the propriety of allowing attorney fees to plaintiff under authority of 29 U.S.C. § 794a(b) (1982). The trial court allowed attorney fees with the amount thereof to be determined at a later date. Ultimately, the matter of the amount of attorney fees was left for determination by the appellate court. The federal statute (29 U.S.C. § 794a[b]) provides a court in its discretion *may allow* the *prevailing party* reasonable attorney fees. As plaintiff did not prevail on appeal, the issue is now moot.

The judgment is reversed.

LOCKETT, J., concurring.