No. 78,862

CITY OF TOPEKA, a Kansas Municipal Corporation, *Appellee,* v.
WATERTOWER PLACE DEVELOPMENT GROUP and WATER-
TOWER PLACE DEVELOPMENT CORPORATION, *Appellants.*

(959 P.2d 894)

Opinion filed
May 29, 1998.

*Dwight D. Sutherland, Jr.,* of Lathrop & Gage L.C., of Kansas City, Missouri,
argued the cause and was on the brief for appellants.

*Anne Lamborn Baker,* of Wright, Henson, Somers, Sebelius, Clark & Baker,
LLP, of Topeka, argued the cause, and *Thomas E. Wright,* of the same firm, was
with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: The City of Topeka (City) and the Watertower
Place Development Group (Watertower) entered into a contract
giving Watertower exclusive rights to develop an area in the City.
The City filed a declaratory action, claiming Watertower had
breached the contract and, therefore, the City was no longer bound
by the contract. Watertower filed a counterclaim for specific per-
formance and monetary damages. The district court entered sum-

mary judgment for the City, finding the contract to be unambiguous and that the City had properly terminated the contract due to Watertower's breach. Watertower appealed, claiming (1) an alleged breach of contract is an issue of fact to be determined by a jury; (2) the district court's determination that the City had properly terminated the contract was not supported by substantial competent evidence; (3) the district court incorrectly based its grant of summary judgment upon the testimony of an expert; (4) the district court had previously ruled the City had committed an anticipatory breach of the contract; and (5) the district court failed to address all of Watertower's arguments.

## BACKGROUND

In an attempt to stimulate growth in blighted business districts within cities, the Kansas Legislature passed the Redevelopment of Central Business District Areas Act, K.S.A. 12-1770 *et seq.* Under the Act, the legislature authorized cities to acquire property and issue special obligation bonds. K.S.A. 12-1770. Pursuant to the Act, the Topeka City Council established the Watertower redevelopment district. As a result, the City was authorized to acquire the property and issue special obligation bonds to pay for the acquisition. The bonds were to be financed by an increase in ad valorem taxes that the City anticipated would result from the redevelopment. K.S.A. 12-1771(h).

The parties decided to take advantage of the Act. On January 16, 1990, the City entered into a contract granting Watertower the exclusive rights for 15 years to develop the Watertower redevelopment district in Topeka. Although the contract comprises 34 pages, the parties' disagreements arise from "Section 11. Commitment to be provided by the Developer," which provides in part:

"Within one hundred eighty (180) days of the City's adoption of any Redevelopment Project Plan . . ., the Developer . . . shall provide to the City either: (i) the commitment of a purchaser of Tax Increment Financing Special Obligation Bonds (the 'Bonds') to be authorized and issued by the City for the Project's financing in accordance with the authority granted the City under the Act . . . ."

Under Section 11, the monies generated by the bonds were to be used to acquire the property in the development area and to prepare the area for construction of the development.

Section 11 also provided the methodology for Watertower's compliance with the commitment of a bond purchaser, providing:

"The Commitment shall not be deemed sufficient until approved and accepted in writing by the City, which approval shall not be unreasonably withheld, provided however, if the Commitment is not approved by the City within 21 days after receipt thereof by the City, the City shall specify with particularity the portion of the Commitment and with particularity the reason why such portion does not meet with its approval. The Developer shall have one additional ninety (90) day period thereafter to provide a Commitment acceptable to the City. *In the event Developer fails to obtain the Commitment for a particular Project for which a Redevelopment Project Plan has been approved, Developer shall have no liability whatsoever as a result thereof relative to that particular Project, however, in such case the City may, subject to the provisions of Section 6 herein, (i) terminate this Agreement thereby extinguishing the Developer's exclusive right to develop the Projects contemplated by the Plan; or (ii) terminate the Redevelopment Project Plan for that particular Project under consideration and obtain a different developer for that Project;* or (iii) act as is otherwise agreed to in writing by the City and the Developer." (Emphasis added.)

The parties dispute whether Watertower or the City failed to comply with Section 11.

As noted above, Section 11 required Watertower to provide a purchaser of bonds by a specific date. Toward that end, Watertower provided a letter authored by B.C. Christopher, which promised to "pursue, on a best efforts basis, the financing for the required land acquisition, relocation, improvement, and demolition costs through the sale of tax increment bonds." B.C. Christopher's commitment to use best efforts to market the bonds was subject to nine conditions. It is undisputed that Watertower intended the B.C. Christopher letter to satisfy the requirements under Section 11. It is also undisputed that the City did not accept the letter as fulfilling the commitment and considered Watertower to have breached the contract. Due to the breach, the City sent a contract termination letter to Watertower.

It was later discovered that the City Council did not follow the Kansas Open Meetings Act requirement when voting to terminate the contract. Instead, the city attorney, in executive session, explained to the council that he intended to terminate the contract with Watertower unless the council members talked to him after

the meeting and objected to the termination of the contract. No council member objected, and the letter of termination was sent to Watertower on May 19, 1993.

Subsequent negotiations attempting to breathe new life into the project, through modification of the old contract or the creation of a new contract, continued into 1994.

The City ultimately determined that further negotiations were fruitless and on July 27, 1994, the City brought a declaratory judgment action in the district court, seeking judicial declaration that the contract was terminated and Watertower was no longer the exclusive developer of the project. Watertower counterclaimed, seeking specific performance of the contract and damages from the breach of contract by the City. First, the district court granted summary judgment to the City on Watertower's claim it was entitled to specific performance of the contract. That judgment was appealed and upheld by the Court of Appeals. That ruling is not before this court.

Subsequently, the City filed for summary judgment, claiming that it had not breached the contract, but rather it had terminated the contract on May 19, 1993, pursuant to Section 11 of the contract. The district court found there were no material factual disputes. Therefore, the parties' disagreement was one of contract interpretation, which is a question of law to be decided by the court.

The district court then found that the contract was unambiguous in that it required a commitment to purchase bonds, rather than a best effort to market the bonds. The district court concluded that because the letter from B.C. Christopher had not complied with Section 11, the letter was insufficient; no cure occurred within 90 days as required by the contract and, as a result, the city attorney's letter of May 19, 1993, notified Watertower that the contract was terminated.

The district court, in granting summary judgment, rejected Watertower's argument that the City had not complied with Section 11 in that the City had failed to state, with particularity, its objection to the B.C. Christopher commitment letter. It held:

"The contract required the City to specify with particularity the portion of the commitment and the reason why the City did not accept the proposed commitment as sufficient. The City Attorney sent the developers a letter notifying the Developers that the B. C. Christopher letter, if intended to be a commitment, was not sufficient because it was not a commitment to purchase the Bonds but simply a promise to use their best efforts to market the Bonds. This notice was sufficient to inform the Developers that the contract required a definite commitment to purchase, not just a promise to market. Therefore the City is entitled [to] summary judgment as a matter of law with regard to the sufficiency of notice given to the Developers."

The district court similarly rejected Watertower's contention that the contract termination was ineffective because it did not come to a vote before the City Council and because the discussion of it was not held in public. The district court granted summary judgment in favor of the City. Watertower's subsequent motion for reconsideration of the grant of summary judgment was denied by the district court.

Watertower appealed. Pursuant to K.S.A. 20-3018(c), the case was transferred.

## Standard of Review

The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260, 891 P.2d 435 (1995).

Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. *Sunflower Park Apts. v. Johnson*, 23 Kan.

App. 2d 862, Syl. ¶ 1, 937 P.2d 21 (1997). The interpretation and legal effect of written documents are matters of law upon which our standard of review is unlimited. *Kansas Gas & Electric Co. v. Will Investments, Inc.*, 261 Kan. 125, Syl. ¶ 1, 928 P.2d 73 (1996).

## DISCUSSION

1. Barring factual disputes, is the question of a breach of contract one for the jury, and was there sufficient competent evidence to support the trial court's decision that the city had given sufficient notice of the breach to Watertower?

Watertower's first two arguments are interdependent. They are: (1) The determination of whether a contract was breached is a fact question for the jury; and (2) the district court's decision that the City was in compliance with its contractual obligation is unsupported by substantial competent evidence.

The district court first determined that the contract was unambiguous and, thus, its interpretation is a matter of law to be decided by the court. See *Gore v. Beren*, 254 Kan. 418, 426-27, 867 P.2d 330 (1994); *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 691, 840 P.2d 456 (1992) (holding that whether a contract is ambiguous is a question of law for the court).

Section 11 of the contract required Watertower to provide the City with "the commitment of a purchaser of Tax Increment Financing Special Obligation Bonds (the "Bonds") to be authorized and issued by the City for the Project's financing in accordance with the authority granted the City under the Act." In interpreting this clause, the district court held:

"The contract required a commitment to purchase the Bonds. The Developers only provided a promise to market the Bonds on a best efforts basis, and not a commitment to purchase the Bonds. Therefore the City is entitled to summary judgment as a matter of law with respect to the Developers' failure to provide a commitment of a purchaser."

First, Watertower argues that the district court erred by determining Watertower had breached the contract. It asserts that the question whether the facts establish a breach of contract is a question for the jury. In support of this argument, Watertower cites *Gregory v. Harrison*, 191 Kan. 481, 382 P.2d 470 (1963). In *Greg-*

*ory*, an architect orally agreed to draw up housing plans for a developer. In lieu of paying for the plans, the developer orally agreed to sell the lots only to those persons willing to use the architect's plans. For each sale, the architect was to receive $100. The developer did not pay the architect when he sold the lots. The district court granted the developer's demurrer to the architect's evidence. We reversed, finding there was sufficient evidence to require that a jury determine if the contract had been breached.

Here, unlike *Gregory*, there is a written contract and the parties stipulated to the material facts. The parties' disagreement is whether these facts constitute a breach. Watertower cited no case standing for the proposition that when there are no disputed facts, summary judgment is inappropriate in a breach of contract case.

Where a district court determines that a written instrument is not ambiguous, no other fact findings or conclusions of law are necessary. See *In re Estate of Cline*, 258 Kan. 196, 206, 898 P.2d 643 (1995). The interpretation and legal effect of written instruments are matters of law. Under these circumstances, the question of whether the contract was breached was for the judge to determine.

2. Was there notice provided as required by the contract?

Watertower does not dispute the district court's conclusion that the contract requires a commitment to purchase the bonds. Instead it argues the City's October 27, 1992, letter to Watertower did not state that B.C. Christopher's commitment to market the bonds was insufficient. In response to this argument, we note that the district court held:

"The City Attorney sent the developers a letter notifying the Developers that the B.C. Christopher letter, if intended to be a commitment, was not sufficient because it was not a commitment to purchase the Bonds but simply a promise to use their best efforts to market the bonds. This notice was sufficient to inform the developers that the contract required a definite commitment to purchase, not just a promise to market. Therefore the City is entitled [to] summary judgment as a matter of law with regard to the sufficiency of notice given to the Developers."

On appeal, Watertower asserts that the district court's finding was wrong.

Section 11 required Watertower to provide a commitment to purchase bonds. Watertower had 180 days from the time the City passed the plan to provide this commitment. It did not do so. The City repeatedly complained to Watertower as to the lack of commitment and the particulars of the deficiency. This was acknowledged more than once by Watertower. Only after the contract was terminated did Watertower complain about the lack of particularity in the City's complaints.

3. Did the district court erroneously consider objectionable opinion evidence?

Watertower next asserts the district court wrongly entered summary judgment based upon the opinion testimony of an expert. Supreme Court Rule 165 (1997 Kan. Ct. R. Annot. 180) provides:

"In all contested matters submitted to a judge without a jury including motions for summary judgment, the judge shall state the controlling facts required by K.S.A. 60-252, and the legal principles controlling the decision. If evidence was admitted over proper objections, and in his reasons for the decision the judge does not state that such evidence, specifying the same with particularity, was not considered, then it shall be presumed in all subsequent proceedings that the evidence was considered by the judge and did enter into his decision."

The evidence objected to as opinion evidence is the deposition testimony of Ike Parsons, a B.C. Christopher Vice-President, who testified that the letter did not represent a commitment on B.C. Christopher's part to purchase the bonds.

The first problem with this contention is that the testimony of Parsons is not opinion testimony. As a B.C. Christopher Vice-President, Parsons was competent to testify as to the meaning of the letter he wrote. Secondly, Parsons did not testify as to whether the letter was in compliance with Watertower's contractual obligations. Watertower's assertion that as to the letter Parsons was testifying as an expert witness is incorrect.

4. Was the contract illegally terminated?

Watertower next claims that the City did not properly or lawfully terminate the contract because the City Council did not vote during an executive session to terminate the contract.

Watertower asserts that because the contract and the Act are silent, the termination of the development contract is governed by Topeka City Ordinance § 2-428, which provides: "The power and authority to purchase, sell, exchange, lease of owned property, or approve lease agreements for additional space shall be vested in the city council, the governing body of the city. No sale, exchange, purchase, or lease of real property shall be valid except by deed or contract approved by the governing body and signed by the mayor." Watertower argues that the contract was one involving real estate; therefore, its cancellation required a vote by the City Council.

Section 23 of the contract provides the methodology as to how the parties may terminate the contract. The contract provides that the City may terminate the contract with 30 days' notice if Watertower did not fulfill its obligations under Section 11. The contract and the Act are silent as to how the City must approve termination of development contracts; it says simply that the City "may" terminate.

While the contract contains provisions under which the City will temporarily acquire real property, the portions of the contract that govern the relationship of the parties is separate from the purchase of such property. To acquire the property pursuant to the contract, the City would be required to comply with Topeka Ordinance § 2-428. Section 2-428 is inapplicable to the termination of the contract between Watertower and the City.

5. Did the City violate the Kansas Open Meetings Act?

Watertower correctly asserts that the manner in which the City terminated the contract was in violation of the Kansas Open Meetings Act, K.S.A. 75-4317 *et seq.* (KOMA). The termination decision did occur during an executive session in violation of the KOMA. In an executive session, the city attorney informed the City Council that Watertower had breached the contract and he would terminate the contract unless one of the council members directed him not to. No council member objected. The city attorney sent the termination notice by letter the next day. Therefore, Watertower is correct in that there was never a vote by the City Council ter-

minating the contract with Watertower in an open meeting. The issue is, if the City violated the KOMA in terminating the contract, can the district court enter judgment in favor of the City for breach of contract?

During oral argument, Watertower stated it had requested the attorney general to void the contract, as permitted by KOMA. The attorney general refused to do so because Watertower's request was not timely pursuant to KOMA. Voidance of the City's actions, under KOMA, must be done within 10 days.

The rights of private entities to enforce KOMA were stated in *Stoldt v. City of Toronto*, 234 Kan. 957, 678 P.2d 153 (1984). While private parties have standing to seek injunctive and mandamus relief, only the attorney general, district attorneys, and county attorneys have standing to void governmental acts based upon violations of KOMA. 234 Kan. 957, Syl. ¶ 1. Watertower was precluded from seeking the voidance of the City Council's actions based on a KOMA violation. The district court was correct in not granting relief to Watertower.

6. Had the district court already found the City to be in breach?

Watertower next argues that the district court previously found that the City had committed an anticipatory breach or repudiation of the contract. The basis of this claim is the district court's order denying Watertower's motion for specific performance and injunctive relief, stating: "The Court further finds that the City has in effect repudiated the contract, regardless of whether defendants have done so."

Taken in the context of determining whether Watertower still had contractual rights to be the exclusive developer (and Watertower claimed that it had not breached the contract), the district court was simply saying that regardless of who breached, the contract was terminated and Watertower no longer had exclusive rights. Watertower previously appealed this issue. The Court of Appeals held:

"According to *both* parties, a ruling as to whether the City rightfully terminated the contract pursuant to its terms, or simply repudiated the contract, is not necessary for this court to decide the questions presented.

. . . .

"The primary question still before the district court is whether the City legally terminated the contract because of Watertower's failure to perform to the City's satisfaction under § 11 of the contract or whether the City wrongfully repudiated the contract." (Emphasis added.)

It is plain from the Court of Appeals' opinion that the issue of who breached was still to be determined and that *both* parties had acknowledged that fact. Watertower's argument simply takes surplus verbiage out of context.

7. Had the City waived its right to terminate or should it be estopped from doing so?

Watertower asserts the district court did not consider its waiver and estoppel arguments. The basis for Watertower's argument is that the city attorney told Watertower that the termination of the contract was a "negotiating tactic" and that the City Council reinstated the contract by amending it twice after its termination. The district court did not address waiver or estoppel arguments.

For support of its first assertion, Watertower cites the deposition testimony of Chester Gentry, one of Watertower's employees. Gentry testified that he was surprised upon receiving the termination letter. He called the city attorney. According to Mr. Gentry, the city attorney stated, "I had to do this, but I want to work something out with you guys, I mean, this isn't the end."

The City Council did later vote to reinstate the contract twice, but the specific language of each of the subsequent ordinances clearly stated that the prior contract had been terminated and if the developer met specified conditions, the contract would be amended. There is no evidence that Watertower met those conditions.

Waiver implies that a party voluntarily and intentionally gives up a known right or takes some action inconsistent with the contractual right. Equitable estoppel requires the showing that a party took action or made a representation such that another party reasonably relied upon it to the party's detriment. *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan 523, 526-27, 561 P.2d 792 (1977).

After terminating the contract with the letter to Watertower, the City attempted to revive the contract through negotiation. At every juncture, the City Council and the city attorney informed Watertower the contract had been terminated. The City did not intentionally give up any right or take action inconsistent with any right. There can be no reasonable reliance by Watertower that the City intended not to terminate the contract.

Affirmed.