Original
No. 2003-827

### PETITION OF THE GOVERNOR AND EXECUTIVE COUNCIL

Argued: March 1, 2004
Opinion Issued: April 28, 2004

*Brown, Olson & Wilson, P.C.*, of Concord (*Bryan K. Gould* and *Philip R. Braley* on the brief, and *Mr. Gould* orally), for the petitioners.

*Peter W. Heed*, attorney general (*Wynn E. Arnold*, senior assistant attorney general, on the brief and orally), for the State.

*Tober Law Offices, P.A.*, of Portsmouth for the Honorable John T. Broderick, Jr., filed no brief.

*Richard J. Lehman,* senate legal counsel, and *Betsy B. Miller,* house legal counsel, by brief for the President of the New Hampshire Senate and the Speaker of the New Hampshire House of Representatives, as *amici curiae.*

PER CURIAM. On December 24, 2003, the petitioners, Craig Benson as Governor of the State of New Hampshire, and the Executive Council of the State of New Hampshire, petitioned this court pursuant to Supreme Court Rule 11 to exercise original jurisdiction and rule that RSA 490:1, as amended by Chapter 50:1, Laws 2001, is unconstitutional. The Office of the Attorney General appeared in opposition. The President of the New Hampshire Senate and the Speaker of the New Hampshire House of Representatives filed *amicus* briefs defending the constitutionality of the statute. For the purposes of this order, all parties appearing in opposition to this petition will be referred to as respondents.

On December 29, 2003, the justices of this court recused themselves from participating in the case. In accordance with RSA 490:3 (1997), this panel was assembled, and convened on March 1, 2004 to hear the matter. We are persuaded that a clear and substantial conflict exists between the statute and the plain language of the New Hampshire Constitution and that, therefore, the statute is invalid upon inescapable grounds.

The statute in dispute, RSA 490:1 (Supp. 2003), provides:

> The supreme court shall consist of 5 justices appointed and commissioned as prescribed by the constitution. On the effective date of this section, the administrative position of chief justice shall be held by the justice with the most seniority on the court for a period of up to 5 years. Each succeeding chief justice shall serve for a period of up to 5 years and shall be the justice with the most seniority of service on the court who has not yet served as chief justice. A justice may decline to serve as chief justice; however, no justice shall be permitted to serve successive terms as chief justice. In the event that all 5 justices have served a term as chief justice, succeeding chief justices shall serve rotating 5-year terms based on seniority.

The statute for the first time purports to "unbundle" the administrative functions traditionally attributed to the chief justice from his or her underlying judicial functions.

The petitioners submit two arguments in support of their proposition that RSA 490:1 is unconstitutional. First, the petitioners argue that RSA 490:1 is unconstitutional because the legislative branch lacks the requisite constitutional authority to prescribe the method of selection of judicial

officers and impermissibly limits the chief justice's term of office. The petitioners advance two sub-arguments in support of that proposition.

First, they argue the legislature does not have any power with respect to the appointment of judicial officers as that power has been expressly committed to the executive branch pursuant to Part II, Article 46 of the New Hampshire Constitution. Part II, Article 46 provides: "All judicial officers . . . shall be nominated and appointed by the governor and council[.]" The petitioners contend the legislature is without power to alter this constitutionally prescribed method of selection of judicial officers.

Second, the petitioners claim the chief justice position on the supreme court is a separate and distinct office from that of associate justice. The petitioners submit RSA 490:1 erroneously presumes the only constitutional attributes of a judicial office are adjudicative powers. The petitioners argue that, if the term "judicial office" is understood to include administrative functions, the legislature would be without authority to enact RSA 490:1, as the power to appoint the chief justice would lie exclusively with the executive branch pursuant to Part II, Article 46. While the petitioners acknowledge both the chief justice and associate justices have the same adjudicatory powers in common, they submit their judicial powers are not limited to adjudication and in particular that the chief justice has enhanced judicial powers by way of additional and unique constitutionally delegated duties. The petitioners cite the New Hampshire Constitution, Part II, Articles 40 and 73-a as examples of those unique duties. Article 40 provides: "Whenever the governor shall be impeached, the chief justice of the supreme judicial court, shall, during the trial, preside in the senate, but have no vote therein." N.H. CONST. pt. II, art. 40. Article 73-a provides:

> The chief justice of the supreme court shall be the administrative head of all the courts. He shall, with the concurrence of a majority of the supreme court justices, make rules governing the administration of all courts in the state and the practice and procedure to be followed in all such courts. The rules so promulgated shall have the force and effect of law.

N.H. CONST. pt. II, art. 73-a. The petitioners argue those powers given to the chief justice pursuant to Articles 40 and 73-a are inherent powers that exist in the judicial branch and are not executive or legislative powers and that the exercise of those powers is exclusively a judicial function. For that reason, the petitioners submit that pursuant to the constitution the chief justice position is a separate judicial office.

The petitioners' second argument is that RSA 490:1 encroaches upon the power of the executive branch and the independence of the judicial branch

in violation of the separation of powers doctrine under Part I, Article 37 of the New Hampshire Constitution. Article 37 provides in pertinent part: "In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit[.]" N.H. CONST. pt. I, art. 37. Specifically, the petitioners submit RSA 490:1 violates the separation of powers doctrine because it confiscates the power of appointment from the executive branch and encroaches upon the independence of the judiciary by limiting the tenure of the chief justice. The petitioners warn that legislative enactments such as RSA 490:1, if left unchecked, could pave the way for complete domination by the legislature. The petitioners assert if RSA 490:1 is allowed to stand, the legislature could further diminish the independence of the chief justice by shortening the 5-year term or imposing other restrictions.

The standard governing our review of RSA 490:1 is premised on the rule that "[t]he constitutionality of a legislative act is to be presumed, and a statute is not to be held unconstitutional unless a clear and substantial conflict exist[s] between it and the constitution." *State v. Marshall*, 64 N.H. 549, 550 (1888) (citing *Rich v. Flanders*, 39 N.H. 304 (1859)). Thus, a legislative act "will not be declared invalid except upon '[i]nescapable grounds.'" *Sirrell v. State*, 146 N.H. 364, 370 (2001) (quoting *Niemiec v. King*, 109 N.H. 586, 587 (1969)). In this regard, "[t]he court does not inquire into the expediency or wisdom of such legislation." *State v. Roberts*, 74 N.H. 476, 480 (1908) (citations omitted). We will address the petitioners' arguments seriatim.

A brief history of our judiciary is helpful to an understanding of this issue. The New Hampshire Constitution, as enacted in 1776, did not provide for an independent judicial system—judicial functions were carried out by the legislature. Douglas, *Judicial Review and the Separation of Powers Under the New Hampshire Constitutions of 1776 and 1784*, 18 N.H.B.J. 250, 252-53 (1977). "The government basically consisted of one branch, a bicameral legislature with a house of representatives and a smaller council of twelve." *Grinnell v. State*, 121 N.H. 823, 827 (1981) (citation omitted). All public officers, including judges, were appointed by the Assembly and Council under the 1776 constitution. Douglas, *supra* at 252. It was not until the constitution was amended in 1784 that separation of powers was provided. *Id.* "Three reforms were enacted with the purpose of fostering an independent judiciary. Judges were given the constitutional right to permanent and honorable salaries, were prohibited from holding plural offices, and were granted tenure during good behavior." *Grinnell*, 121 N.H. at 827 (citations omitted). The provisions guaranteeing permanent tenure and honorable salaries were

"considered particularly important as a means of ending arbitrary removals." *Id.* The provisions also ensured the independence of the judiciary. *In re Mussman,* 112 N.H. 99, 102-03 (1972).

The first chief justice appointed to this court under the New Hampshire Constitution of 1784 was Josiah Bartlett in 1790. Justice Bartlett was nominated and appointed to the position by the governor and council. However, because the courts at that time were not constitutionally "established," political strife often interfered with the tenure of judges and the operation of the judiciary. The legislature used its powers under Part II, Article 4 of the constitution as well as "address" "to 'reconstruct' or 'reconstitute' the courts" at will. Douglas, *supra* at 259. Between 1790 and 1901, the legislature abolished and reorganized the entire court system five times, thus effectively addressing any sitting judges out of office. In 1901, the court system was reorganized for the last time. Since 1901 until the enactment of the statute at bar, *all* chief justices of this court have been nominated and appointed by the governor and executive council, and their oaths of office and commissions have been specific to that office.

There is no dispute that the constitution explicitly reserves the power of appointment of all judicial officers to the executive branch. N.H. CONST. pt. II, art. 46. Nor can it be disputed that the chief justice is a judicial officer. To say otherwise defies logic, reason and tradition. While there is nothing in the constitution that specifically creates or defines the office of chief justice of the supreme court, the position is assumed to exist as evidenced by Articles 40 and 73-a. Similarly, there is nothing in the United States Constitution which specifically sets out a citizen's right of privacy. Yet, that right is now deeply rooted in federal constitutional law. Like the right of privacy under the federal constitution, the traditional appointment of the chief justice by the governor and council for over two hundred years has effectively rooted that power in our state constitution.

The respondents' position is that the chief justice is not a discrete judicial officer requiring nomination and appointment by the governor and council. This argument is dependent upon the view that the only constitutional duties of a judicial officer are adjudicative. To that end, because the chief justice's adjudicatory duties do not differ from the adjudicatory duties of the associate justices, the respondents contend that the chief justice position is not separate and distinct. The respondents' argument is further dependent upon the view that the chief justice's constitutionally prescribed administrative and legislative duties are not part of his or her judicial duties, but rather are auxiliary and independent.

That the powers allocated to the chief justice in Part II, Articles 40 and 73-a are non-adjudicatory in nature does not suggest that they

function in an ancillary fashion to the chief justice's "judicial" powers as the respondents assert. The administrative and legislative powers and duties assigned to the chief justice by the constitution are inextricably bound together with those adjudicatory duties and are incidents of and inherent in that office.

This concept, that judicial duties consist of more than just adjudicatory powers, is nowhere more apparent than in Supreme Court Rule 38, the Code of Judicial Conduct. Canon 3 of Rule 38 provides that judges' judicial duties include "*all* the duties of the judge's office prescribed by law." SUP. CT. R. 38, Canon 3 (Supp. 2003-04) (emphasis added). The rule goes on to state: "In the performance of *these duties*," specific standards apply. *Id.* (emphasis added). The rule then outlines standards concerning judges' adjudicative, administrative, and disciplinary responsibilities. *Id.* No lines of distinction whatever are drawn between judges' adjudicatory and administrative duties—both are classified as "judicial duties."

Furthermore, a review of the relevant case law draws no distinction between a judge's adjudicatory and administrative duties. In *Mussman*, a case involving the removal of a district court judge from the bench for ethical violations, this court determined that the supreme court's general superintendence power is absolute. *Mussman*, 112 N.H. at 101. We held that the court's superintendence power included not just the power to correct adjudicatory errors made by lower tribunals, but also the power to "approve rules of court and prescribe and administer canons of ethics with respect to such courts[.]" *Id.* We acknowledged that while this court does not have the power to impeach a judicial officer, as that is solely a legislative function as provided in the constitution, it does have the power "to take disciplinary action short of removal from office under its general power of superintendence[.]" *Id.* We noted: "It has never been the tradition of the jurisprudence of this court to refuse to exercise *judicial power* when there was an established need for it and there was no constitutional barrier to its exercise." *Id.* at 103 (emphasis added) (citations omitted). We further observed that the exercise of these judicial powers "has been supported by consistent custom, is confirmed by statute . . . and enforced by judicial decisions." *Id.* at 101 (citations omitted). Thus, we held the performance of superintendent powers, or administrative duties, was a proper exercise of *judicial power*. There was no distinction drawn between "judicial powers" and administrative powers.

In *In re Mone*, 143 N.H. 128, 138 (1998), we determined that, a statute removing the responsibility for court security from the judiciary and vesting it with the executive branch, violated the separation of powers doctrine because it encroached upon the judiciary's inherent power to control courtroom functions and ensure the fair adjudication of

controversies. In discussing the origin of the judiciary's administrative powers, we observed: "Although not specifically set forth in the constitution, *powers reserved for the judiciary arise from its most fundamental duty to interpret and administer the law." Id.* at 134-35 (emphasis added) (citations omitted). We noted that the judiciary's exercise of administrative powers to control its courtrooms specifically did not interfere with the separation of powers doctrine because "security is an integral part of the essential adjudicatory function of the courts." *Id.* at 138. Accordingly, we concluded in that instance the judiciary's administrative powers derived from its adjudicatory powers.

While the respondents attempt to draw a distinction between "judicial" duties and the administrative or legislative duties granted separately to the chief justice, we are not convinced that such a distinction exists in fact or in law. We have consistently reiterated that "this court has the responsibility to protect and preserve the judicial system. We have the *inherent authority* to take whatever action is necessary to effectuate this responsibility." *Opinion of the Justices,* 140 N.H. 297, 300 (1995) (emphasis added) (legislative bill requiring supreme court to suspend the pay of a judge removed from the bench unduly interfered with court's superintendence powers, an exclusively judicial function). This inherent judicial authority includes the use of superintendent powers that flow from and support our essential adjudicatory functions.

All judicial officers have administrative duties in that they are responsible, *inter alia,* for maintaining control of their courtrooms and ensuring proper security. *See Mone,* 143 N.H. at 138. The chief justice of this court is no exception to this rule and exercises the ordinary administrative duties that stem from his or her judicial power, as well as the additional and unique administrative and legislative duties provided pursuant to Part II, Articles 40 and 73-a of the constitution. In other words, while the chief justice is permitted, and in fact now specifically required, to perform both adjudicatory duties and administrative or legislative duties, all three are part and parcel of his or her "judicial power."

Subsequent to our decision in *Mussman,* Part II, Article 73-a was adopted, codifying the common law concept that the chief justice is the administrative head of the judiciary. As such, according to Article 73-a, the chief justice has the power and the duty to promulgate rules and regulations to ensure the proper operation of the judiciary. Article 73-a grants to the chief justice, as incident to that office, special and unique constitutional duties. While the chief justice's powers under Part II, Article 73-a are both administrative and legislative in nature, they are powers necessary to ensure effective and efficient judicial operation. The

fact that the chief justice's powers under Article 73-a are not adjudicatory in nature does not transmogrify them into executive or legislative functions. *See Mussman,* 112 N.H. at 100. The functions themselves remain essentially judicial.

The same is true with regard to the chief justice's constitutional duties pursuant to Part II, Article 40, which requires the chief justice to preside over impeachment proceedings in the legislature. We have held in the past that the fact the chief justice presides over legislative impeachment proceedings does not transform them into judicial proceedings. *Mussman,* 112 N.H. at 100. This logic compels the conclusion that simply because the chief justice is presiding over a legislative proceeding, he or she is not transformed into a legislator. "In this State the *nature of the act performed* rather than the title of the performer determines whether an act is legislative or [judicial]." *Opinion of the Justices,* 110 N.H. 359, 364 (1970) (emphasis added) (citation omitted). While the chief justice is required to preside over impeachment hearings before the legislature, the nature of that act remains judicial. When presiding over *any* legal proceeding, the chief justice acts in his or her judicial capacity and as a judicial officer to ensure that a fair and impartial trial occurs. An impeachment hearing is no exception.

Whether the statutory mechanism of rotating 5-year terms for the chief justice position better serves the public than executive nomination and appointment is not a question for this court to consider. The question before us is whether the legislature is empowered by the constitution to declare it so. Our answer to this question is that the legislature is not so empowered. Part II, Article 46 of the New Hampshire Constitution emphatically provides: "*All* judicial officers . . . shall be nominated and appointed by the governor and council[.]" (emphasis added). There have been no exceptions to this mandatory language. The legislative branch is no less constrained than the other branches of government to stay within the limitations of the constitution. *See Trustees of Phillips Exeter Acad. v. Exeter,* 90 N.H. 472, 487 (1940); *Opinion of the Justices,* 4 N.H. 565, 566 (1829). Even if constitutional language appears to leave a vacuum, it does not necessarily follow, as night the day, that the legislature is empowered to fill it.

■ Because there is no basis for a distinction between this court's adjudicatory duties and its administrative or legislative duties when considering the composition of "judicial power," we agree with the petitioners that the chief justice position is a discrete judicial office. Based on Articles 40 and 73-a, the chief justice inescapably holds separate and unique *judicial* powers. Accordingly, the constitution requires that the

chief justice position be filled by executive nomination and appointment, as the separate commissioning of the chief justice historically reflects.

■ We also agree with petitioners that RSA 490:1 violates the separation of powers doctrine under Part I, Article 37 of the New Hampshire Constitution. "Separation of the three co-equal branches of government is essential to protect against a seizure of control by one branch that would threaten the ability of our citizens to remain a free and sovereign people." *Mone*, 143 N.H. at 134 (citation omitted). "Thus, each branch is prohibited by the Separation of Powers Clause from encroaching on the powers and functions of another branch." *Id.* (citation omitted). The separation of powers doctrine is "violated when one branch usurps an essential power of another." *Id.* (citation omitted).

There is no doubt that pursuant to Part II, Article 4 of the constitution, the legislature has "full power and authority to erect and constitute judicatories and courts of record[.]" The appointment of judicial officers, however, is strictly reserved for the executive branch by Part II, Article 46. For over two centuries, governors and executive councils have utilized their Article 46 executive powers to nominate and appoint the chief justice of the supreme court. RSA 490:1 for the first time invades this right of the governor and executive council by categorizing the chief justice as solely an "administrative position." This usurpation of an exclusively executive function violates the separation of powers doctrine. *See State v. LaFrance*, 124 N.H. 171, 176 (1983) ("[A]rticle 37 was adopted to protect the executive and judicial branches of the State government from legislative encroachment.").

Moreover, RSA 490:1 impermissibly encroaches upon the prerogative of the judicial branch. While a complete and total separation of powers is neither possible nor contemplated by the constitution, encroachment by one branch into the essential powers of another is impermissible. Here, the legislature impermissibly encroaches on the position of chief justice and upon the independence of the judiciary. First, the constitution specifically conveys upon *all* judicial officers a lifetime appointment to their respective positions, conditioned only upon good behavior and requiring retirement at the age of seventy. *See* N.H. CONST. pt. II, art. 73 (*modified by* N.H. CONST. pt. II, art. 78). RSA 490:1 divests the chief justice position of this lifetime appointment and replaces it with a rotating 5-year term based on seniority. Because the chief justice position is a discrete one, the legislature's enactment of RSA 490:1 is unconstitutional in that it divests the chief justice of the constitutional right to lifetime tenure (subject to the age limitations set forth in Part II, Article 78). Absent a constitutional amendment, the legislature is without authority to do so.

Second, as the petitioners warn, upholding RSA 490:1 would effectively grant the legislature free license to alter the means of appointment and the term of the chief justice based upon the politics of the moment. "If the proposed jurisdiction might be bestowed, the limits of [legislative] authority would be almost without bounds and indefinite encroachment on judicial power would be possible." *Opinion of the Justices*, 87 N.H. 492, 496 (1935). There is simply nothing to prevent the legislature from further amending the statute at any time to provide for other terms or means of selection of the chief justice by the legislature or otherwise, or to preclude a particular justice from succeeding to the chief justice position. This method of indirectly "addressing" judges out of office, while different in form, is not unfamiliar in theory to the judiciary. In fact, the arbitrary removal of judges from the bench prompted the reforms in 1784 that granted all judges the constitutional right to permanent and honorable salaries and lifetime tenure conditioned only upon good behavior. The reforms, as modified by the 1966 amendment to the constitution, prevented any further arbitrary removals and ensured the judiciary's independence.

While the legislature can no longer abolish the judiciary as a whole, or arbitrarily remove a sitting justice from office, RSA 490:1 would effectively allow it to control the judiciary by manipulating the statute and the chief justice position to its advantage. "It is the [supreme] court's responsibility 'to oversee the operations of the judicial branch for the purposes of maintaining public confidence in the administration of justice.'" *Mone*, 143 N.H. at 137 (quoting *Opinion of the Justices*, 140 N.H. at 299). This confidence and our independence would be jeopardized if our direction is arbitrarily controlled by the hands of the legislature without specific authority in the constitution to do so.

Because RSA 490:1 violates the New Hampshire Constitution, we find the statute unconstitutional. Accordingly, the petition is granted.

*Granted.*

JOHNSON, J., retired, specially assigned under RSA 490:3, concurred; MURPHY, C.J., and TEMPLE, GRAY and HOLLMAN, JJ., retired superior court justices, specially assigned under RSA 490:3, concurred.