The opinion of the court was delivered by
Rosen, J.:
In 1861, the people of the new State of Kansas adopted a constitution that assigned judicial power to a supreme court and to various lower courts:
“The judicial power of the State shall be vested in a supreme court, district courts, probate courts, justices of tire peace, and such other courts, inferior to the supreme court, as may be provided by law; and all courts of record shall have a seal, to be used in the authentication of all process.” Kan. Const. art. 3, § 1 (1861).
This multi-tiered system vested judicial power in both the Supreme Court and district courts, and tire legislature provided rules for the administration of those courts. For example, the General Statutes of Kansas, 1949, provided that seniority on the bench was the criterion for designating a “presiding judge” in larger judicial districts. G.S. 1949, 20-502, 20-602. The presiding judge had the authority to make "reasonable and uniform rules” for assigning actions and practice, for directing business, and for hearing motions, as long as those rules were not inconsistent with the code of civil procedure. G.S. 1949, 20-502.
In 1965, the Kansas Legislature passed the Judicial Department Reform Act, K.S.A. 1965 Supp. 20-318 et seq. The Kansas Supreme Court adopted rules implementing the Act. See Report of the Judicial Advisory Committee, 13 Washburn L.J. 271, 366 (May 1974). In 1966, the Kansas Supreme Court promulgated a new rule governing the assignment of cases in multiple-judge districts, effective July 1, 1967. In relevant part, it read:
“In judicial districts comprised of one county which has seven or more judges . . . [all non-probate cases] shall be under the supervision and control of tire Administrative Judge, who shall be designated by this Court. All cases shall be assigned by the Administrative Judge for trial to the other divisions of the District Court. The Administrative Judge may assign pretrial motions, pretrials and other preliminary matters to other divisions of the District Court.” Rule 120(b), 197 Kan. lxxiv (1966).
In 1968, the Kansas Legislature codified Rule 120(b) by enacting K.S.A. 1968 Supp. 20-329, which read:
*515 “In every judicial district having more than one division, the supreme court may designate an administrative judge who shall have general control over the assignment of cases within said district court subject to supervision by the supreme court.”
As we explained in Behrmann v. Public Employees Relations Board, 225 Kan. 435, 438-42, 591 P.2d 173 (1979), in 1968, the legislature established a citizens’ committee to study and propose amendments to tire constitution. L. 1968, ch. 265. In February 1969, that committee submitted its 124-page report to the legislature. Among the significant recommended changes in Article 3 was the creation of “a unified court with overall administrative and procedural rule-maldng powers in the supreme court branch thereof.” Report of the Citizens’ Committee on Constitutional Revision, p. 43 (February 1969); see Behrmann, 225 Kan. at 440.
The committee’s commentary on the proposed changes revealed that the purposes behind amending Article 3, § 1, included the “[p]roper supervision, administration and discipline of judicial personnel” and “steadfast recognition of and insistence upon vigilant maintenance of the doctrine of separation of powers—with the three branches of government free from encroachments of each other.” (Emphasis added.) The report added that a proposed constitutional amendment unifying the court system
“would create a unified court with overall administrative authority in the supreme court branch thereof and would vest the supreme court with rule making power regarding process, practice, and procedure at all levels of the unified court, as well as regarding appeals. Such rule making power is, in reality, an inherent power of the judiciary.” (Emphasis added.) Report of the Citizens’ Committee, p. 43.
In 1972, die voters- of the state of Kansas, in keeping with the recommendations of the Citizens’ Committee, ratified an amendment to Article 3, § 1, of the constitution, which now reads:
“The judicial power of this state shall be vested exclusively in one court of justice, which shall be divided into one supreme court, district courts, and such other courts as are provided by law, and all courts of record shall have a seal. The supreme court shall have general administrative authority over all courts in this state.” (Emphasis added.)
*516 In 1973, a Judicial Study Advisory Committee was formed pursuant to legislative authorization contained in Senate Joint Resolution No. 2 (1973 Session). Its purpose was to assist in a survey and study of the Kansas court system and to make recommendations to the judiciary and the legislature. See 13 Washburn L.J. at 273.
Among the ills that the Advisory Committee found in need of a cure was “fragmentation of judicial power,” resulting in part in the “unnecessary variations in the practices and procedures of individual local courts.” (Emphasis in the original.) 13 Washburn L.J. at 294. “Sound judicial administration requires clear lines of responsibility and authority as well as the resources adequate to ensure effective implementation of administrative policy.” (Emphasis added.) 13 Washburn L.J. at 360. Accordingly, die Advisory Committee determined that “appointment procedures and trial court management” lay among the Supreme Court’s policy-making responsibilities under the new, unified court structure. 13 Washburn L.J. at 362. This meant that the Chief Justice of the Supreme Court would exercise “general supervision over all matters” subject to the Supreme Court’s policy-making power, including financial affairs of the courts and “the assignment of judges at all levels.” (Emphasis added.) 13 Washburn L.J. at 364. In keeping with this mission, the Advisory Committee recommended that the Supreme Court “appoint a district judge to be the administrative judge of the unified. district court in each judicial district.” 13 Washburn L.J. at 366.
In 1976, the Supreme Court struck what had been Rule 120 and adopted a new Rule 107, which read in relevant part:
“In every judicial district the Supreme Court shall designate an administrative judge who shall have general control over the assignment of cases within said district under supervision of the Supreme Court. Assignment of cases shall be designed to distribute as equally as is reasonably possible the judicial work of the district. The administrative judge of each district shall be responsible for and have general supervisory authority over die clerical and administrative functions of the court.” 220 Kan. lvii (1976).
This rule has since been modified and, effective July 1, 2012, Rule 107 now states in relevant part:
“(a) The Supreme Court will appoint a chief judge in each judicial district.
(1) Appointment. The Supreme Court will appoint a chief judge in each judicial district.
*517 (2) Term. A chief judge is appointed for a 2-year term that begins January 1 in an even-numbered year. An interim appointment is for the remainder of the 2-year term.
(3) Reappointment. On or before November 30 in an odd-numbered year, an incumbent chief judge must notify the Supreme Court whether the judge wishes to be reappointed.
(4) Recommendation. A judge of the district court may recommend to the departmental justice the appointment of a chief judge for the judge’s district. The Supreme Court must keep any recommendations confidential.” (2015 Kan. Ct. R. Annot. 202.)
K.S.A. 20-329 also has been modified over time to harmonize it with Rule 107. In 1999, it was amended to read:
“In every judicial district, tire supreme court shall designate a district judge as chief judge who shall have general control over the assignment of cases within the district, subject to supervision by the supreme court. Within guidelines established by statute, rule of the supreme court or the district court, the chief judge of each district court shall be responsible for and have general supervisory authority over the clerical and administrative functions of such court.” L. 1999, ch. 57, sec. 17.
During the 2014 legislative session, the Kansas Legislature passed Senate Substitute for House Bill No. 2338. Section 11 of H.B. 2338 amended K.S.A. 20-329, which now reads:
“In every judicial district, the district court judges in such judicial district shall elect a district judge as chief judge who shall have general control over the assignment of cases within the district, subject to supervision by the supreme court. The procedure for such election shall be determined by the district court judges and adopted by district court rule. Within guidelines established by statute, rule of the supreme court or the district court, the chief judge of each district court shall be responsible for and have general supervisory authority over the clerical and administrative functions of such court. The district judge designated as chief judge by the supreme court on July 1, 2014, shall be allowed to serve as chief judge through January 1, 2016.” K.S.A. 2014 Supp. 20-329.
Section 43 of H.B. 2338 is a nonseverability clause, which states:
“The provisions of this act are not severable. If any provision of this act is stayed or is held to be invalid or unconstitutional, it shall be presumed conclusively that the legislature would not have enacted the remainder of such act without such stayed, invalid or unconstitutional provision.” L. 2014, ch. 82, sec. 43, effective July 1, 2014.
*518 Larry T. Solomon is tire chief judge of the 30th Judicial District of Kansas. He was initially appointed to serve as chief judge on July 1, 1991, and he has been reappointed continuously through the present. Under K.S.A. 2014 Supp. 20-329 (sec. 11 of H.B. 2338), his current term will end on January 1,2016, and under Rule 107(a) his current term will end on December 31, 2015.
On February 18, 2015, Solomon filed in Shawnee County District Court a petition seeking a declaratory judgment under K.S.A. 60-1704. Solomon sought relief in the form of a judgment declaring sec. 11 of PI.B. 2338 an unconstitutional encroachment on the constitutional authority of the Kansas Supreme Court to administer the judiciary of the state. Solomon also sought to have the entirety of H.B. 2338 declared invalid, arguing that if sec. 11 was declared unconstitutional, the nonseverability clause within sec. 43 prevented the remainder of the bill from being saved.
In response, the State of Kansas filed a motion to dismiss, asserting a lack of standing on Judge Solomon s part and contending that, as a matter of law, the legislative action was not unconstitutional. Judge Solomon countered with a motion for summary judgment, asking that the district court render a decision on the merits.
On September 2, 2015, the district court filed a memorandum decision and order that denied the States motion to dismiss and granted Judge Solomon s motion for summary judgment. On September 3, 2015, the State filed an emergency motion to stay the order pending appeal, in which it asked the district court to stay that part of its order striking all of H.B. 2338 because of tire non-severability clause. On that same day, the district court granted the motion to stay.
The State filed a timely notice of appeal to this court based on K.S.A. 60-2101(b), which permits a final judgment in a civil action in which a state statute was held to be unconstitutional to be appealed directly to this court. On appeal, the State asserts two grounds for reversing the judgment of the district court: lack of justiciability on Solomon’s claim for relief and error by the district court in finding a violation of the separation of powers doctrine. We address these issues in turn.
*519 Justiciability
The State initially argues that this case does not present a justi-ciable case or controversy because Solomon has not suffered and may never suffer a cognizable injury as a result of sec. 11 taking effect. The State contends that Solomon therefore lacks standing to challenge the constitutionality of sec. 11 and that the matter is not yet ripe for adjudication.
We apply an unlimited standard of review to determine whether Solomon has standing to request a declaratory judgment regarding sec.’ll s constitutionality and whether the issue is ripe for decision. See Shipe v. Public Wholesale Water Supply Dist. No. 25,289 Kan. 160, 165-67, 170, 210 P.3d 105 (2009) (applying unlimited standard of review to determine whether district court lacked jurisdiction to render decision because plaintiffs lacked standing and issues they presented were not ripe for adjudication); see also Gannon v. State, 298 Kan. 1107, 1118-19, 319 P.3d 1196 (2014) (whether a claim is justiciable is question of law); Robinson v. Kansas State High School Activities Ass’n, 260 Kan. 136, 139, 917 P.2d 836 (1996) (applying unlimited standard of review to district court’s decision regarding plaintiffs standing in declaratory judgment action).
Solomon brought his action under K.S.A. 60-1704 of the Declaratory Judgments Act, K.S.A. 60-1701 et seq. K.S.A. 60-1704 of that Act states:
“Any person having an interest under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may seek determination of any question of construction or validity arising under that enactment, document or agreement and may obtain a declaration of rights, status or other legal relations thereunder.” (Emphasis added.)
Also relevant to our analysis is K.S.A. 60-1701, which states that “[c]ourts of record within their respective jurisdictions shall have power to declare the rights, status, and other legal relations whether or not further relief is, or could be sought.”
In order to show he had standing to bring a declaratory judgment action, Solomon alleged within his petition that
“[a]s a member of the Kansas judiciary and the chief judge of his district, Judge Solomon has a direct interest in the integrity and viability of the Kansas unified *520 court system as well as the Kansas Supreme Courts vital role in administering the various courts comprising that system, including the district court of the 30th Judicial District. As Chief Judge of one of the district courts directly impacted by H.B. 2338, plaintiff’s status, and other legal relations, are directly affected by the legislation, and thus has standing to seek a declaration of H.B. 2338’s invalidity pursuant to K.S.A. 60-1704.” (Emphasis added.)
Later in his petition, Solomon noted that certain provisions within sec. 11 that call for district court judges in each judicial district to elect their own chief judge and to adopt by district court rule a procedure for conducting such an election were in direct conflict with Rule 107, which states that the Supreme Court will appoint a chief judge in each judicial district for a 2-year term beginning January 1 in an even-numbered year. The rule also provides that any current chief judge who wishes to serve a subsequent 2-year term must notify the Supreme Court on or before November 30 in an odd-numbered year of his or her desire.
Under the plain language of foe Declaratory Judgments Act, Solomon has standing to challenge the constitutionality of sec. 11 because the statute undoubtedly affects his “rights, status or other legal relations" as the current chief judge of foe 30th Judicial District. See K.S.A. 60-1704. Section 11 requires Solomon, along with the other judges in the 30th Judicial District, to develop and adopt a procedure for electing among themselves a chief judge prior to January 1, 2016. Because sec. 11 conflicts with Rule 107, Solomon undoubtedly faces uncertainty and insecurity as to whether he should implement a procedure for electing a chief judge or whether he should proceed under Rule 107 and inform this court as to whether he wishes to serve another 2-year term. The dilemma Solomon currently faces is of the nature that foe Declaratory Judgments Act was specifically enacted to resolve. See K.S.A. 60-1713 (act is remedial in nature and its purpose is “to settle and provide relief from uncertainty and insecurity with respect to disputed rights, status and other legal relations"; should be liberally construed and administered to achieve that purpose).
The State notes that, foe language of the Declaratory Judgments Act notwithstanding, the caselaw of this state still requires that a declaratory judgment action involve an actual case or controversy. See, e.g., State ex rel. Morrison v. Sebelius, 285 Kan. 875, 897, 179 *521 P.3d 366 (2008) (actual cases and controversies are required in declaratory judgment cases); Wagner v. Mahaffey, 195 Kan. 586, 589, 408 P.2d 602 (1965) (well established in this jurisdiction that even in declaratory judgment actions involving the validity of a statute diere must be actual controversy between parties). In order for a legal dispute to present a case or controversy (i.e., be justiciable) under Kansas law, it must satisfy four elements: (1) the plaintiff must have standing; (2) the issue raised cannot be moot; (3) the issue must be ripe, having taken fixed and final shape rather than remaining nebulous and contingent; and (4) the issue cannot present a political question. Gannon, 298 Kan. at 1119; Sebelius, 285 Kan. at 891-92. Again, the State argues that this matter does not present a justiciable case or controversy because (1) Solomon lacks standing and (2) his claim is not yet ripe.
Under Kansas law, in order to establish standing, a plaintiff must show that (1) he or she suffered a cognizable injury and (2) there is a causal connection between the injury and the challenged conduct. Kansas Bldg. Industry Workers Comp. Fund v. State, 302 Kan. 656, 678, 359 P.3d 33 (2015); Gannon, 298 Kan. at 1123. And in order to establish a cognizable injury, a party must show “a personal interest in a court’s decision and that he or she personally suffers some actual or threatened injury as a result of the challenged conduct.” Sierra Club v. Moser, 298 Kan. 22, 33, 310 P.3d 360 (2013). With regard to whether a matter is ripe for adjudication, we have stated:
“As a general rule the courts will not give a construction to or declare the rights of parties upon a state of facts which has not arisen, nor upon a matter which is future, contingent, and uncertain, unless a present right depends upon the decision or there are other special circumstances to satisfy the court that it is desirable at once to decide on the future rights.” Woolums v. Simonsen, 214 Kan. 722, Syl. ¶ 5, 522 P.2d 1321 (1974).
The State argues that because Solomon has not lost and may never lose his position as chief judge as a result of sec. 11 going into effect, he has not suffered a cognizable injury that would give him standing to challenge sec. 11 in a declaratory judgment action. For the same reason, the State argues that the matter is not ripe for adjudication.
*522 In making this argument, the State suggests that the only injury’ Solomon could suffer that would give him standing and malee this matter ripe is the loss of his position as chief judge. But this assertion frames the injury inquiry too narrowly. The State fails to acknowledge that sec. 11, as already noted, places an additional burden upon Solomon by directing him, along with the other judges in the 30th Judicial District, to develop and adopt a new district court rule establishing a chief judge election procedure prior to January 1, 2016.
Although Rule 105 (2015 Kan. Ct. R. Annot. 200) provides that local district court rules are adopted by a majority vote of district court judges within a judicial district, Solomon, as chief judge, is personally tasked with marshalling the process to adopt the required court rule. See K.S.A. 2014 Supp. 20-342 (“After consultation with the district magistrate judges of such court, each district court, by action of a majority of the district judges thereof, may promulgate such rules as may be necessary to provide for the administrative operations of such court . . . .” [Emphasis added.]); Supreme Court Rule 105(a)(2) (2015 Kan. Ct. R. Annot. 200) (“After consultation with the district magistrate judges, the district judges of a judicial district, by majority vote, may adopt rules that are . . . necessary for the judicial district’s administration.” [Emphasis added.]); Supreme Court Rule 107(b)(1) (2015 Kan. Ct. R. Annot. 202) (“The chief judge is responsible for and has supervisory authority over the court’s clerical and administrative functions.” [Emphasis added.]). Additionally, because sec. 11 conflicts with Rule 107, Solomon faces a dilemma between his official duties that is personal to him: should he go forward with implementing a new procedure for electing a chief judge, or should he proceed under Rule 107?
Accordingly, we conclude that Solomon has suffered a specific, personal, and cognizable injury as a result of sec. 11 taking effect. He therefore has standing to bring a declaratory judgment action challenging the constitutionality of sec. 11. Because no additional facts need to arise or be developed in the record, the matter also is ripe for adjudication.
*523 Separation of Powers
The Kansas Constitution vests in the Supreme Court general administrative authority over all courts in this state. Solomon contends H.B. 2338 represents an impermissible invasion by the legislature of the Supreme Court s constitutional administrative authority.
Whether a statute is constitutional is a question of law subject to de novo review. State ex rel. Six v. Kansas Lottery, 286 Kan. 557, 562, 186 P.3d 183 (2008). A statute is presumed to be constitutional, and all doubts must be resolved in favor of constitutionality. If a court can find any reasonable way to construe a statute as constitutionally valid, it must do so. Sebelius, 285 Kan. at 883-84. Before a statute may be struck down, the constitutional violation must be clear. Leek v. Theis, 217 Kan. 784, 792, 539 P.2d 304 (1975).
The 1972 amendment to Article 3, § 1 of the Kansas Constitution vested in the Supreme Court “general administrative authority over all courts in this state.” That phrase is not defined within the provisions of the constitution. In the absence of defining language, constitutional language is deemed “To mean what the words imply to the common understanding of men. In ascertaining the meaning of a constitutional provision courts consider tire circumstances attending its adoption and what appears to have been the understanding of the people when they adopted it.’” Leek, 217 Kan. at 793 (quoting Higgins v. Cardinal Manufacturing Co., 188 Kan. 11, Syl. ¶ 2, 360 P.2d 456, cert. denied 368 U.S. 829 [1961]).
The history of the 1972 amendment, based on the recommendations of the Citizens’ Committee on Constitutional Revision out-fined above, demonstrates unmistakably that the voting citizens understood that the “general administrative authority” included the power to malee rules for process, practice, and procedure at all levels of the unified court system.
Immediately following the adoption of the 1972 amendment, the Judicial Study Advisory Committee emphasized that the amendment was grounded in part on the need for clear fines of responsibility and authority in the administration of district courts ultimately leading back to the Supreme Court. For that reason, *524 appointment procedures and the assignment of judges were the responsibility of the chief justice, subject to the Supreme Courts policy-making authority, under the new constitutional provision. The administrative and appointment powers were considered inherent.
The written constitution is paramount law because it emanates directly from the people. In re Tax Application of Lietz Constr. Co., 273 Kan. 890, 903, 47 P.3d 1275 (2002). As a general rule, the legislature may enact legislation to facilitate or assist in the operation of a constitutional provision, but such legislation must be in harmony with and not in derogation of the constitution. State, ex rel. v. Board of Education, 212 Kan. 482, 488, 511 P.2d 705 (1973). A review of the histoiy of the rules governing the appointment of what are now known as chief judges reveals such a harmony between the procedures set up by the Supreme Court and the laws enacted by the legislature.
Following the passage of tire Judicial Department Reform Act, the Supreme Court adopted rules implementing the act, including a rule for assigning an administrative judge designated by the Supreme Court. The legislature then codified that rule. The legislature subsequently formed a citizens’ committee to make recommendations regarding efficiency and administration of justice. Included in the recommendations of that committee was the establishment of a unified court, vesting in tire Supreme Court supervisory and administrative authority. The legislature adopted the recommendations of the committee and offered to the voters of this state a constitutional amendment that provided the Supreme Court with the authority the citizens’ committee called for.
After the voters approved this amendment, the legislature formed an advisory committee to assist it with implementing reforms consistent with the new constitutional language. The committee recommended, among other things, that supervisory authority over all matters lie with the Supreme Court, including the assignment of judges at all levels and the appointment of chief judges. Consistent with these recommendations, the Supreme Court promulgated Rule 107, and, consistent with both the report of its own advisory committee and with the Supreme Court’s exercise of its new constitutional directive, the legislature codified that *525 rule in K.S.A. 20-329. This history demonstrates that the judicial branch and the legislature acted cooperatively to carry out the will of the voters of this State in establishing an efficient, capable, and unified independent judicial branch.
The doctrine of independent governmental branches is firmly entrenched in United States and Kansas constitutional law. As early as Hayburn’s Case, 2 U.S. (2 Dall.) 409, 410, 1 L. Ed. 436 (1792), the United States Supreme Court declared that “by the Constitution of the United States, the government thereof is divided into three distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either.” A century later, in Kilbourn v. Thompson, 103 U.S. 168, 190-91, 13 Otto 168, 26 L. Ed. 377 (1880), the Court stated:
“It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of tire powers appropriate to its own department and no other.”
As it pertains to the doctrine of separation of powers, the Kansas Constitution is almost identical to the federal Constitution. Gleason v. Samaritan Home, 260 Kan. 970, 982, 926 P.2d 1349 (1996). The doctrine is an inherent and integral element of the republican form of government and is expressly guaranteed to the states by the federal Constitution. 260 Kan. at 982.
The Kansas Supreme Court has the authority and duty to preserve the constitutional division of powers against disruptive intrusion by one branch of government into the sphere of a coordinate branch of government.
“The supreme court, in the exercise of its jurisdiction given to it by the constitution and the statutes, may protect its own jurisdiction, its own process, its own proceedings, its own orders, and its own judgments; and may, in cases pending before it, prohibit or restrain the performance of any act which might interfere *526 with the proper exercise of its rightful jurisdiction in such cases.” C.K.&W. Rld. Co. v. Comm’rs of Chase Co., 42 Kan. 223, Syl. ¶ 1, 21 P. 1071 (1889).
“It can hardly be supposed that the action of the supreme court may be thwarted, impeded, or embarrassed by the unwarranted intermeddling of others without any power in the supreme court to prevent it.” 42 Kan. at 225.
Solomon contends that, by enacting sec. 11 of H.B. 2338, the legislature improperly exerted control over an administrative function of the Supreme Court that is constitutionally reserved to the judicial branch. One department of government usurps the powers of another department when it exercises coercive influence on the other. State, ex rel., v. Bennett, 219 Kan. 285, 290, 547 P.2d 786 (1976). In order for the interference by one department with the operations of another department to be unconstitutional, the intrusion must be significant. 219 Kan. at 290.
In granting Solomons summary judgment motion, the district court gave great weight to a simple test for determining whether a legislative act violates the separation of powers doctrine. This test was derived from State v. Mitchell, 234 Kan. 185, 195, 672 P.2d 1 (1983), where language can be found asserting that, when court rules and a statute are in conflict, the constitutional mandate of the Supreme Court must prevail. Although the district court applied this language, and although the parties argue vigorously about whether Mitchell provides a bright-fine test, we see no need to rely upon Mitchell in resolving the matter before us. Other bases are readily available for analyzing separation of powers disputes, and these guidelines provide a more thorough and nuanced demonstration that constitutional lines of authority have been crossed.
In reviewing whether one branch of government has significantly interfered with the operations of another to the point of violating the doctrine of separation of powers, courts commonly consider four factors: (1) the essential nature of the power being exercised; (2) the degree of control by one branch over another; (3) the objective sought to be attained; and (4) the practical result of blending powers as shown by actual experience over a period of time. Miller v. Johnson, 295 Kan. 636, 671, 289 P.3d 1098 (2012); Sebelius, 285 Kan. at 884; Bennett, 219 Kan. at 290-91.
*527 Applying these factors to the present case, the first factor relates to the essential power being exercised. Article 3, § 1 of the Kansas Constitution grants the Supreme Court “general administrative authority over all courts in this state.” Here, the essential power is the administration of district courts and administrative positions within those courts, which are guided by chief judges. The Supreme Courts general administrative authority has been defined as the power “to promulgate and enforce reasonable rules regulating judicial administration and court procedure as necessary for the administration of justice.” Mitchell, 234 Kan. at 194. At issue before us is the question of to whom a chief judge must respond and in which direction fines of authority flow—to other judges in the district or to the Supreme Court? The State maintains that the focus should be on the distinction between administrative authority and legislative power to govern administration. Solomon argues that the nature of the power here being exercised is fundamentally one of court administration. We agree with Solomon.
The district court, after noting the fundamental disagreement about the nature of the power at issue, analyzed the powers and duties of a chief district court judge and found that “there is little doubt that tire fundamental nature of the position is administrative. Put another way, the position of chief district court judge is one of the principal instruments through which the Kansas Supreme Courts constitutionally granted ‘general administrative authority’ over the courts in Kansas is wielded.”
After addressing the State’s argument analogizing the constitutional power of the Governor, codified at Article 1, § 3 of the Kansas Constitution, and that of the Kansas Supreme Court, an argument the State similarly puts forth before this court, the district court concluded: “Thus, while the [governor’s] administrative authority contained in tire ‘supreme executive power’ may be implicit, the Kansas Supreme Court has been given constitutionally explicit ‘general administrative authority.’ This distinction renders the Defendant’s comparison to the relationship between the Executive and Legislative branches of government unavailing.” We see no purpose in repeating the sound reasoning of the district court on this factor and conclude that the selection of a chief *528 district court judge is an essential power more closely related to the Supreme Court’s general administrative authority than to the legislature s power to appoint. We further note that the legislature in H.B. 2338 empowered these locally selected chief judges with new discretionary responsibilities regarding district court budget expenditures, compensation to be paid to district court personnel, as well as the power to hire, promote, suspend, demote, and dismiss all personnel as necessary to carry out tire functions and duties of each judicial district. See K.S.A. 2014 Supp. 20-384. Such provisions would only further fragment what is constitutionally designed to be a unified state court system and harken back to the days of pre-1972 court administration.
The second factor relates to the degree of control exerted by the legislature over the judiciaiy. Having found that the position of chief judge is an essential component of the Supreme Courts constitutionally derived general administrative authority, we conclude that the legislative interference represents a direct and explicit removal of appointing authority from the Supreme Court and dilutes the Supreme Courts authority over the administration of district courts. This authority is a function this court has exercised since unification nearly 50 years ago, and both the removal of this authority is in derogation of the both the explicit language of our State s constitution and in opposition to tire will of the electorate as expressed in the recommendations of the citizens’ committees that led to both the constitutional amendment and the enabling legislation. The goal of the 1972 amendment to tire constitution was both explicitly and implicitly to unify tire court system. The intervention by the legislature in 2014 would result in removal from tire Supreme Court of an essential component of its constitutionally mandated administrative authority. By taking the power to appoint chief judges away from the Supreme Court, the legislature has exerted its power over a fundamental component of the judiciary.
The third factor looks to tire objective sought by tire statute. Both parties and the district court agreed that this factor is “ perhaps tire least important’ ” inquiry into whether or not a violation of the separation of powers has occurred because “ ‘a bill that significantly interferes with the Kansas Supreme Court’s administrative *529 authority surely cannot be salvaged by a worthy motive, or vice versa/” The State suggests the legislature was likely influenced by written testimony of four 18th Judicial District judges who stated chief judges should be selected by peers, who know them best and work with them most closely. One also asserted that the measure would return control of local judicial districts to those districts. This second objective is directly contrary to the aim of the 1972 constitutional amendment, which sought to reduce “fragmentation of judicial power” and the concomitant “unnecessary variations in the practices and procedures of individual local courts.” Such an objective is also radically at odds with the “clear lines of responsibility and authority” advocated by the legislature’s own Judicial Study Advisory Committee.
The fourth factor, the practical result of the blending of constitutional powers as evidenced by experience, is difficult to evaluate. To the extent that our research has been able to ascertain, Kansas has never provided for the local election of chief judges by their peers. The State suggests that nearby states have had statutory schemes in place for years that are similar to the one at issue here. We have no information, however, regarding whether the duties associated with those similarly titled positions in other states are equivalent to responsibilities entrusted to chief judges in Kansas. Further, there is no indication in the caselaw of those states of litigation challenging administrative efficiency of those statutes. But caselaw from other jurisdictions reveals several decisions in which similar encroachments violated the separation of powers doctrine. (See cases cited below.) In any event, the statute at issue before us now does not involve a “blending” of legislative and judicial powers; it represents a direct replacement of judicial authority by legislative authority.
Application of these four factors strongly suggests that sec. 11 represents an impermissible intrusion on the part of the legislative branch into the constitutionally mandated administrative authority of the Supreme Court. This conclusion is supported by decisions in several of our sister states. While none is exactly on point, each informs us that the appointing power of the Supreme Court is essential to its effective administration of the judicial system.
*530 In Judicial Attorneys Ass’n v. Michigan, 459 Mich. 291, 586 N.W.2d 894 (1998), the Michigan Supreme Court considered a statute that designated counties to be tire employers of court employees and divided personnel responsibilities between the counties and the chief judges. The court held that the powers of the judicial branch necessarily include the administrative function of controlling those who work widrin the judicial branch, and the statutory scheme impermissibly encroached on the judicial branch. 459 Mich. at 297-98, 301.
In Petition of Governor & Executive Council, 151 N.H. 1, 846 A.2d 1148 (2004), the New Hampshire Supreme Court considered a statute declaring the office of chief justice to be an administrative position and providing for justices to serve rotating 5-year terms as chief justice in order of seniority. The court found the statute to be an unconstitutional encroachment on the administrative authority of the supreme court. The court warned that giving the legislature license to alter the means of appointment and the term of the chief justice would subject the judiciary to the “politics of the moment.” 151 N.H. at 10.
In In re PL. 2001, Chapter 362, 186 N.J. 368, 895 A.2d 1128 (2006), the New Jersey Supreme Court considered the constitutionality of a statute establishing a unit of armed probation officers within the administrative office of the courts. The court concluded that “[bjecause the Act fatally compromises the independence of the judiciary, and hopelessly blurs the line between the role of our courts and law enforcement, we have no choice but to declare the Act unconstitutional.” 186 N.J. at 373. Considering state constitutional language similar to that in the Kansas Constitution, the court determined that its constitution gave “the Chief Justice and the Supreme Court sweeping authority to govern their own house.” 186 N.J. at 379. The court stated that “it is the Courts power over administration that permits it to define the terms and conditions of employment of judiciary personnel and the functions they serve within the court system.” 186 N.J. at 381. The state supreme courts authority over administration “is ‘unfettered’ and ‘plenary,’ in contrast to its authority over practice and procedure, which is ‘subject to law.’” 186 N.J. at 382.
*531 In County of Erie et al. Appeal, 93 Pa. Commw. 258, 501 A.2d 697 (1985), the Pennsylvania Commonwealth Court considered a county-enacted nepotism rule that the county personnel director sought to enforce against court employees. A district court judge appointed a probation officer, and the county attempted to enjoin the appointment because of a conflict with the nepotism rule. The appellate court held that the rule “affects the power of the judiciary to hire, fire and supervise court-appointed personnel” and it therefore was “constitutionally inapplicable to such personnel as are court-appointed.” 93 Pa. Commw. at 261. Where “the hiring, firing and supervision of court-appointed personnel is concerned,” “any law which encroaches upon or affects this power must be struck down unless there exists independent constitutional authorization.” 93 Pa. Commw. at 262-63.
In State v. McLeod, 274 S.C. 81, 261 S.E.2d 303 (1979), the attorney general in South Carolina brought a declaratory judgment action seeking judicial determination of the constitutionality of a statute that provided for the chief justice of the state supreme court to appoint circuit court judges to preside over public utility rate cases before the utility commission. The court held that the statute impermissibly encroached on the authority of the executive branch; it also infringed on the authority of the judicial branch to allocate judicial duties. 274 S.C. at 85.
In State v. Riley, 274 S.C. 106, 262 S.E.2d 404 (1980), the South Carolina Supreme Court addressed the constitutionality of a legislatively created court of appeals. The supreme court generally upheld tire legislatures authority to create such an appellate court, but it held that certain provisions of the statute violated the doctrine of separation of powers. A provision granting power to the chief judge of the court of appeals to assign circuit judges to sit with the court unconstitutionally infringed on the constitutional power of the chief justice of the supreme court to assign judges to sit in any court within the unified judicial system. 274 S.C. at 112. The statute vesting the court of appeals with the power to set additional terms for that court unconstitutionally infringed on the authority of the chief justice of the supreme court, as the administrative head of the unified judicial system, to set terms of any court within the *532 unified system. 274 S.C. at 112-13. Finally, a provision that records of the court of appeals should be kept in a manner prescribed by tire judges violated the constitutional article providing that the supreme court should make rules governing the administration of all the cojurts of the state. 274 S.C. at 114.
In State ex rel. Crabtree v. Hash, 180 W. Va. 425, 376 S.E.2d 631 (1988), the West Virginia Supreme Court considered the appointment powers of the state s chief justice. A state statute authorized the local bar to elect a judge if a district court judge was disqualified or otherwise unable to conduct court. The supreme court promulgated a rule giving the chief justice the power to assign temporary circuit judges. The state constitution, like that of Kansas, explicitly made the chief justice the “administrative head of all courts.” The constitution also allowed the chief justice to assign judges from one court to another and explicitly stated that supreme court rules supersede any statutes that conflict with those rules. 180 W. Va. at 426-27. Relying on those provisions, the supreme court found sufficient conflict between rules and statutes to hold the statute to be an unconstitutional encroachment on the authority of the supreme court. 180 W. Va. at 428.
The language of our constitution and application of caselaw factors for analyzing issues in cases involving separation of powers leads us to an ultimate opinion that is consistent with the opinions of courts in other jurisdictions: the means of assigning positions responsible to the Supreme Court and charged with effectuating Supreme Court policy must be in the hands of the Supreme Court, not the legislature. By enacting sec. 11 of H.B. 2338, the legislature asserted significant control over a constitutionally established essential power of the Supreme Court. Unlike previous legislation which was enacted in harmony with Supreme Court rules, sec. 11 directly conflicts with the mission of the Supreme Court in establishing an efficient and unified administrative structure for the courts. Courts in other jurisdictions have reached analogous conclusions about legislative interference with the administration of courts.
*533 Before closing, we mention two final, specific points. First, the State would have us hold that Article 15, § 1 of the Kansas Constitution governs. It provides that the legislature may prescribe the appointment of officers whose election or appointment is not otherwise provided for by law. This argument is untenable because the position of chief judge is not a public officer. At common law, the markers for service as a public officer were a publicly provided salary, the exercise of some element of sovereign power, the taking of an oath of office, and service for a predetermined term. See Markham v. Cornell, 136 Kan. 884, 897-98, 18 P.2d 158 (1933); In re Carroll, 91 Kan. 395, 398, 137 P. 975 (1914); Moore v. Nation, 80 Kan. 672, 673, 103 P. 107 (1909); see also K.S.A. 75-4308 (requiring oath of office); Farley v. Board of Education of City of Perry, 62 Okla. 181, 183, 162 P. 797 (1917); Gracey v. St. Louis, 213 Mo. 384, 393, 111 S.W. 1159 (1908); Baltimore City v. Lyman, 92 Md. 591, 594, 48 A. 145 (1901); State of Iowa v. Spaulding, 102 Iowa 639, 647-48, 72 N.W. 288 (1897); People v. Myers, 33 N.Y. St. Rep. 18, 11 N.Y.S. 217, 218 (1890). Chief judges, as independent officials, are not subject to a particular oath requirement, in that they take no oath of office beyond their oaths as judges. See K.S.A. 25-2807; see also Moore, 80 Kan. 672, Syl. ¶¶ 1,3 (additional duties assigned to judge do not create separate office for that judge). Further, sec. 11 would set no term for chief judges. Because á chief judge does not occupy an office distinct from the office of district court judge, Article 15, § 1 does not apply to the appointment of chief judges.
Second, we note that the district court relied on sec. 43 of H.B. 2338, a nonseverability clause, to strike the legislation in its entirety. Neither party has challenged the validity of that portion of the district court ruling, and we accordingly do not address it here. We note only that our holding appears to have practical adverse consequences to the judiciary budget, which the legislature may wish to address, even though those concerns played no part in our analysis.
Conclusion
We agree with the district court that sec. 11 of H.B. 2338 is unconstitutional, and we hold that Rule 107 remains in full effect. The decision of the district court is affirmed.
*534 Nuss, C.J., not participating.
Michael J. Malone, Senior Judge, assigned. 
[[Image here]]