NOT DESIGNATED FOR PUBLICATION

No. 124,039

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SOUTH MULBERRY PROPERTIES, L.L.C.,
*Appellee/Cross-appellant*,

v.

GT MANAGEMENT, L.L.C.,
*Appellant/Cross-appellee*.

MEMORANDUM OPINION

Appeal from Crawford District Court; LORI BOLTON FLEMING, judge. Opinion filed October 21, 2022. Affirmed in part, reversed in part, and remanded.

*Todd E. Shadid* and *Joseph A. Dempewolf*, of Klenda Austerman LLC, of Wichita, for appellant/cross-appellee.

*David M. Traster*, of Foulston Siefkin LLP, of Wichita, and *Kevin F. Mitchelson*, of Wheeler & Mitchelson, Chartered, of Pittsburg, for appellee/cross-appellant.

Before WARNER, P.J., HURST, J., and TIMOTHY G. LAHEY, S.J.

PER CURIAM: GT Management, L.L.C. (GT), owns the land upon which it operates a landfill under a permit from the Kansas Department of Health and Environment (KDHE). South Mulberry Properties, L.L.C. (South Mulberry), is exercising its exclusive option to repurchase the real estate upon which the landfill sits. At issue is whether the underlying contract and applicable law require GT to close the landfill when it conveys the property to South Mulberry. The district court granted partial summary judgment in favor of South Mulberry, finding the contract requires GT to close the landfill before it transfers the land to South Mulberry. GT appeals that ruling.

1

South Mulberry filed a second summary judgment motion seeking a declaratory ruling that GT was responsible for addressing off-site waste found on property located just north of the landfill. The district court denied that motion, and South Mulberry cross-appeals that determination.

As explained below, we reverse the grant of partial summary judgment because neither the contract nor Kansas law require closure of the landfill when title to the landfill property is transferred. And we find the district court did not err when it declined to find GT responsible for addressing off-site waste because the issue is not ripe.

FACTUAL AND PROCEDURAL BACKGROUND

The two issues on appeal arise from separate summary judgment rulings by the district court. As such, the facts we consider are limited in scope to the uncontroverted facts in the respective motions and responses. With respect to the ruling that GT must close the landfill, there is no dispute as to the underlying material facts. We summarize those facts first.

In April 1998, John and Rosemary Massa entered into a contract to sell 40 acres of land to Southeast Kansas Construction and Demolition Landfill, L.L.C., a Kansas company (SEK), for use as a construction and demolition landfill, waste tire monofill and processing facility, and open burn pit facility (the Landfill). The contract, which applies to the parties' successors and assigns, required SEK to obtain a permit from the KDHE and comply with applicable environmental statutes, regulations, ordinances, and permits.

When SEK obtained a KDHE permit, the Massas signed a warranty deed conveying the property. SEK also filed a restrictive covenant limiting use of the property after the Landfill's closure to grassland and pasture. The Landfill opened in May 1999.

2

In January 2008, the contract was amended to allow SEK to sell the property. SEK thereafter sold the property and transferred its KDHE permit to another company, which then sold the property and transferred the permit to GT, subject to the original 1998 agreement as amended. GT has operated the Landfill from April 2009 to the present time.

The contract provided the Massas the option to repurchase the property after the Landfill became full, or in 20 years, whichever occurred first. In 2017, approaching the 20-year mark, the Massas advised GT they intended to exercise their option to repurchase the property and sent $100 as required under the contract. The Massas asked GT to begin the process of closing the Landfill. GT agreed to convey the property back to the Massas but would not close the Landfill; it explained the contract's repurchase option only required it to close the Landfill when it had finished exploiting the Landfill, not after the 20-year term. Just prior to the filing of this lawsuit, the Massas transferred their contract rights to South Mulberry.

Ownership and operation of the Landfill are regulated by the KDHE, and the 1998 contract requires it be operated in conformance with Kansas law and the KDHE regulations. The full context of the required conformance is set forth in the three specific contract provisions included in South Mulberry's statement of facts. Paragraph 8 of the contract, entitled "ENVIRONMENTAL MATTERS" provides:

"Buyer agrees during the period of time that he will be using the real estate purchased herein for a construction and demolition landfill, waste tire monofil[l], waste tire processing facility, and open burn pit, that Buyer will in connection with the use, ownership, condition or operation of his businesses as above-stated, comply in all material respects with all laws, ordinances, permits, orders, statutes, rules, permitting and licensing requirements, determinations and regulations promulgated or issued or applied by any municipal, local, city, county, state or federal court, agency, board, legislature, commission or other legislative, judicial, administrative, or regulatory body relating to

3

the protection of the environment (including, without limitation, ambient air, surface water, ground water and land, natural resources, wildlife or human health) (including, without limitation, all environmental laws concerning emissions, discharges, spills, leaks, releases or threatened releases of petroleum (including, without limitation, oil, used oil, waste oil, gasoline, constituents thereof and petroleum based fuels), petroleum bi-products, petroleum waste, petroleum contaminated soils, salt water, asbestos, waste associated with oil and gas drilling, expiration production activities, pollutants, contaminants, deleterious substances, chemicals, special waste, or radioactive substances and materials, or hazardous substances, toxic substances, or hazardous waste, as those terms are defined in any environmental law.)"

Paragraph 9 of the contract made the sale contingent upon Buyer obtaining a KDHE permit to operate the Landfill on the property. It states:

"Buyer is purchasing the real estate herein solely for the purposes of operating a construction and demolition landfill, waste tire monofil[l], waste tire processing facility, and an open burn pit, all in conformance with the laws of the State of Kansas and as a condition precedent to Buyer's obligation to close herein, Buyer will apply for the appropriate permits from the State of Kansas, specifically through the Kansas Department of Health and Environment, and upon receiving said permits Buyer shall thereafter immediately proceed to close."

Finally, paragraph 10 specifically addresses the repurchase option:

"a. When Buyer, or its assigns or grantees, finish the exploitation of said land for the purpose of the operation of a construction and demolition landfill, waste tire monofil[l], waste tire processing facility, and burn pit, or upon the expiration of twenty (20) years, whichever shall first occur, Sellers may exercise their option to repurchase the real estate herein by notifying Buyer within ninety (90) days of Buyer's termination of operations as above-stated, or the expiration of twenty (20) years from the date of the execution of this Agreement that Sellers desire to repurchase said real estate, and along with said notice tender the sum of One Hundred and no/100 ($100.00) Dollars payable to Buyer, its successors or assigns.

"In no event, shall the exercise of the exclusive option herein granted interfere with Buyer's obligations to close its operation as a construction and demolition landfill, waste tire monofil[l], waste tire processing center, or open burn pit in compliance and conformance with the then existing rules and regulations of the State of Kansas or such other governmental entities which shall have jurisdiction over such operation.

"b. Failure of Sellers to exercise their option to repurchase as above-stated, shall operate as a cancellation and termination of said option, and thereafter Buyer shall be free to place the real estate for sale on the open market or continue to own the same at Buyer's sole option and discretion."

Additional uncontroverted facts include that the Landfill has remaining capacity, it can generate additional revenue, and the cost to close the Landfill will exceed $400,000. In December 2016, GT provided the KDHE with an irrevocable letter of credit in the amount of $504,234 to meet the KDHE's financial assurance guidelines. In September 2017, the KDHE sent a letter to South Mulberry's attorneys advising them that K.S.A. 65-3406(a)(18) places responsibility for long-term care of a landfill site on the owner of the site, and further that a person acquiring ownership rights in a permitted site prior to its closure is subject to all requirements of the permit for the site. The letter concludes, "The implication is that a person taking ownership of a solid waste disposal site prior to the site's closure becomes responsible for the site's closure." The parties also agree that it will take GT more than 90 days to complete initial closure of the Landfill. At the time of the district court's ruling, the property had not yet been transferred to South Mulberry, and GT continues to own and operate the Landfill.

In February 2019, the district court granted South Mulberry's motion for partial summary judgment. The court concluded paragraph 10 requires GT to close the Landfill when the option to repurchase is exercised. The district court rejected GT's contention that it was obligated to close the Landfill only when it finished exploitation of the Landfill but not upon the exercise of the repurchase option after 20 years. The ruling

5

requires GT to close the Landfill before it transfers the property to South Mulberry, and the court found Kansas law and regulations specify the steps necessary to close and monitor a construction and demolition landfill.

After obtaining the partial summary judgment ruling in its favor, South Mulberry sought a declaratory judgment that GT would be responsible for any KDHE-required clean-up of waste, which had been dumped and buried on its land located just north of the Landfill property. South Mulberry argued the 1998 contract requires GT Management to address the waste as part of its obligation to close the Landfill, and the permit requires the current operator to mitigate a prior operator's conduct. To that end, South Mulberry requested a declaratory judgment that GT was contractually or statutorily liable for clean-up of the off-site waste in the event the KDHE initiated an enforcement action.

After discovery of the waste, South Mulberry contacted the KDHE in March 2018 and, with the help of a neighbor, dug test holes, which revealed buried construction and demolition waste mixed with small amounts of household trash. Many of the specific facts are controverted, but the parties appear to agree that one of GT's predecessors, rather than GT itself, was responsible for the waste. During this litigation, the KDHE informed South Mulberry that it believed the off-site dumping was unrelated to the Landfill. Though open to receiving additional information, the KDHE advised South Mulberry that it would be responsible for the waste unless the responsible party's identity could be confirmed. Specifically, the KDHE requested a signed affidavit by someone with firsthand knowledge of the facts surrounding the dumping; absent that evidence, the KDHE would begin an enforcement action if South Mulberry did not address the waste. South Mulberry responded that it believed the dumping occurred between May 1999 and March 2001 by SEK, but it did not provide an affidavit. Though South Mulberry indicated it was unlikely that it could provide that affidavit, it believed it could provide compelling circumstantial evidence that SEK was responsible.

As factual support, South Mulberry attached the affidavit of the neighbor who owned and worked at a quarry north of the Landfill. He stated that between 1999 and 2008, he observed someone from the Landfill digging pits and hauling and covering waste on the property north of the Landfill. Based on these observations, he had been able to locate and uncover this waste when digging test holes for the KDHE in March 2018.

In denying the second summary judgment motion, the district court ruled that even if the neighbor's statements were accurate, the contract and the KDHE permit do not address off-site conduct or liability for trespasses or contract breaches by prior owners. Additionally, the court found Kansas law does not require GT Management to remediate off-site dumping by a predecessor. And the court's prior ruling regarding GT Management's closing obligation does not extend to off-site waste dumped by a prior owner. Based on these reasons, the court declined to issue a declaratory judgment. As this disposed of all outstanding claims, the court's order served as a final judgment.

GT Management challenges the district court's finding that South Mulberry's exercise of the repurchase option upon the expiration of the 20-year term requires it to close the Landfill. South Mulberry argues the court erred by not issuing a declaratory judgment finding GT Management responsible for addressing the off-site waste.

DISCUSSION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal, we apply the same rules, and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Patterson v. Cowley*

7

*County*, 307 Kan. 616, 621, 413 P.3d 432 (2018). Summary judgment may be appropriate in contract cases when there are no disputed material facts. See *Ives v. McGannon*, 37 Kan. App. 2d 108, 116, 149 P.3d 880 (2007). Although the parties do not agree on all of the specific facts in this case, they agree the foregoing material facts are not in dispute and that resolution of the case turns on the interpretation of the underlying contract and related statutory and regulatory rules governing the operation of the Landfill.

Contract interpretation presents a legal question appellate courts review de novo. *Trear v. Chamberlain*, 308 Kan. 932, Syl. ¶ 1, 425 P.3d 297 (2018). "[R]egardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect." *City of Topeka v. Watertower Place Development Group*, 265 Kan. 148, Syl. ¶ 2, 959 P.2d 894 (1998). When interpreting a written contract, the primary rule is to ascertain the parties' intent. If the contract's terms are clear, the intent of the parties is to be determined from the contract language without applying the rules of construction. *Stechschulte v. Jennings*, 297 Kan. 2, 15, 298 P.3d 1083 (2013). Extrinsic evidence may be used to determine that intent only if an ambiguity exists. *Chamberlain*, 308 Kan. 932, Syl. ¶ 2.

Here, both parties contend there is no ambiguity in the language, so the intent of the parties is to be determined from the language used in the contract. We also interpret contracts by construing and considering the entire instrument from its four corners—not by isolating one sentence or provision. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). It is a basic rule of contract law that courts will allow parties to choose the terms by which they will be bound under written agreements. *Squires v. Woodbury*, 5 Kan. App. 2d 596, 598, 621 P.2d 443 (1980), *rev. denied* 229 Kan. 671 (1981).

I. *Does the contract or Kansas law require GT to close the Landfill prior to transferring ownership?*

GT asserts the district court erred by concluding it must close the Landfill, arguing that neither the contract nor Kansas law mandate closure when a landfill is transferred. We agree.

Our analysis begins by noting that each party interprets the contract language differently and in a manner that benefits itself. But neither party contends the contract is ambiguous nor seeks to present any extrinsic evidence to bolster their suggested interpretation. Thus, because ambiguity is not a point of contention on appeal, we rely solely on the contract language to determine its intended meaning.

Reading the contract as a whole, we find the parties intended the Landfill be operated in compliance with all applicable statutory and regulatory provisions governing its operation at all times, including at the time of closure or transfer of the property. Paragraphs 8 and 9 of the agreement call for compliance with all regulatory standards at the outset and during the time the Landfill is in operation. Like the parties, we necessarily focus on the specific language of paragraph 10 because it addresses the particular point of contention between the parties.

Paragraph 10(a) of the 1998 contract grants South Mulberry the option to repurchase the property after 20 years or when GT has finished exploiting the Landfill, whichever occurs first. It goes on to state, in part:

> "In no event, shall the exercise of the exclusive option herein granted interfere with [GT's] obligations to close its operation as a construction and demolition landfill, waste tire monofil[l], waste tire processing center, or open burn pit in compliance and conformance with the then existing rules and regulations of the State of Kansas or such other governmental entities which shall have jurisdiction over such operation."

9

There is a single option to repurchase the Landfill property, and we agree with the district court that the language concerning closure obligations was intended to apply whether the option was exercised at the time the Landfill was fully exploited or at the end of 20 years. But we part ways with the district court's analysis when it concludes that the contract language requires GT to close the Landfill because South Mulberry is exercising its exclusive repurchase option.

The plain language of paragraph 10 does not impose an absolute obligation on GT to close the Landfill. Rather than creating an independent contractual obligation on GT that it be responsible for closure of the Landfill, the closure obligations are those required by Kansas law at the time closure occurs. Thus, the contract directs that "in no event" shall exercise of the option interfere with GT's obligation to close the Landfill "in compliance and conformance with the *then existing rules and regulations* of the State of Kansas or such other governmental entities which shall have jurisdiction over such operation." (Emphasis added.) The parties did not agree that GT would close the Landfill when the option was exercised; they agreed that closure obligations would be in conformance and compliance with the KDHE regulations in effect at the time the option was exercised. It is fair to say the parties did not know what closure obligations GT would ultimately have because those obligations were based on the regulation in effect at the time the option was exercised rather than on the regulatory requirements at the time the contract was signed.

South Mulberry contends the inclusion of the phrase "in no event" in the language of paragraph 10 is significant because that indicates the parties intended GT to be obligated to close the Landfill whenever the option was exercised, either after the Landfill was fully exploited or at 20 years. It argues that any other interpretation renders the "in no event" language meaningless. But, as part of the closure process, Kansas regulations require the owner or operator of a construction and demolition landfill to do several things, which the parties recognize will take at least 90 days. For example,

10

closure requires installation of a final cover over a landfill. K.A.R. 28-29-304(g)(1)(A)-(B); K.A.R. 28-29-321(b)(1). And the owner or operator must repair and maintain that cover during the 30-year postclosure period. K.S.A. 65-3402(n); K.A.R. 28-29-321(c). The parties knew at the time the contract went into effect that GT's closing obligations could require continuing access to the property after it was transferred back to South Mulberry. Future regulations could have expanded or contracted those obligations, and the phrase "in no event" in paragraph 10 makes it clear that the exercise of the option cannot interfere with GT's closure obligations, whatever they might be under the then-existing regulations.

GT's *contractual* closure obligations are the same whether South Mulberry exercises its option after 20 years or when the Landfill is full—GT must comply and conform with the then-existing KDHE regulations. The contract could have provided that GT be responsible for closure no matter what the law required, or it could have provided closure obligations were to be based on the rules and regulations in effect at the time the contract was executed, but it did not. GT's closure obligations are determined by referencing the rules and regulations in effect at the time the option is exercised. GT's precise obligation regarding closure was not known at the time of the execution of the contract. And the applicable regulations could have changed such that responsibility for closure, in all circumstances, was placed entirely upon a party taking ownership of landfill property. Or the regulations could have mandated closure whenever landfill property is sold without a concurrent transfer of the permit. The point being that GT's closure obligations can only be determined by referencing the rules and regulations in effect at the time the option is exercised. The fact there has been little change in the governing regulations since the contract was signed does not change the analysis.

If GT is obligated to close the Landfill, that obligation arises from the KDHE rules and regulations. We must therefore look at the KDHE rules and regulations governing closure of the Landfill.

A review of applicable regulations confirms closure of the Landfill is not required at present. There is no KDHE rule or regulation requiring closure of landfill property before, or because, it is sold or transferred. And South Mulberry admits "it is true that the regulatory scheme does not require closure of the landfill upon transfer of title to the property."

Under the KDHE regulations, closure of a landfill occurs when disposal permanently ceases, the landfill is abandoned, becomes full, or the permit is revoked. "'Closure' means the permanent cessation of active disposal operations, abandonment of the disposal area, revocation of the permit or filling with waste of all areas and volume specified in the permit and preparing the area for the long-term care." K.S.A. 65-3402(m). If GT had finished exploiting the Landfill, that would meet the regulatory definition of closure and GT consequently would have been required to fulfill its closure obligations, as GT admits. But at the present time, the undisputed facts show that disposal of waste has not ceased, the Landfill has not been abandoned or become full, and the permit has not been revoked, so closure is not required.

KDHE regulations recognize transfer may occur before closure is required, and the consequences are spelled out in the regulations. One consequence being that closure and postclosure responsibility then falls upon the new landowner, as outlined in the letter from the KDHE to South Mulberry's counsel. When ownership of a permitted landfill transfers after it accepts waste but before closure occurs, the new owner "shall be subject to all requirements of the permit for the site or facility, including the requirements relating to long-term care of the site or facility." K.S.A. 65-3406(a)(18). Furthermore, even without a permit to operate the landfill, the new owner becomes responsible for closing the landfill according to the approved closure plan. See K.A.R. 28-29-308.

12

The district court ruled that GT was the owner and operator of the Landfill and therefore responsible for meeting all closure and postclosure requirements referenced in the KDHE letter to South Mulberry. The court reasoned that South Mulberry has "no right of ownership until the closing of the repurchase is complete" and then held "[South Mulberry] is not obligated to close on the repurchase prior to the closure of the landfill being completed by Defendant." The court's ruling also requires closure of the Landfill before the transfer of title occurs. We find no basis for these findings in the language of the contract or the applicable KDHE regulations.

South Mulberry also argues that nothing in the agreement indicates the Massas or South Mulberry ever intended to take over operation of the Landfill, and, comparing the cost of closure to the amount of how much they received in compensation, requiring them to close the Landfill is unreasonable. Conversely, it argues that GT has the existing permit and the financial wherewithal to cover the cost of closure. But these current-day extrinsic fact considerations do not shed any light on what was intended 20 years ago when the contract was signed. No language in the agreement suggests that the relative financial condition of either party is a factor to be considered in allocating the burdens of closure. Furthermore, the contract does not require repurchase of the property—if it does not make financial sense, South Mulberry can decline to exercise the option.

And while it is true that the agreement does not explicitly indicate the Massas or South Mulberry ever intended to operate the Landfill, there is also no express indication in the contract that South Mulberry did not so intend. Whether South Mulberry ever intended to operate the Landfill is ultimately of no consequence in determining GT's closure obligations. What is clear from the contract is that the parties intended that GT's closure obligations were dependent upon and derived from the KDHE regulations in effect at the time of the option. As South Mulberry admits, those regulations do not require closure before ownership of the Landfill property is transferred.

13

We make no finding whether or not GT may ultimately have closure obligations required by its KDHE permit or future events as those issues were not raised in South Mulberry's partial summary judgment motion. The extent of our ruling is to address the court's ruling on partial summary judgment. We hold GT is not contractually obligated to close the Landfill based on South Mulberry's exercise of its exclusive option and therefore reverse the district court's partial summary judgment ruling. We remand the case to the district court for further proceedings consistent with this court's ruling.

II. *The district court did not err by declining to issue a declaratory judgment because the off-site waste issue is not ripe.*

In its cross-appeal, South Mulberry argues the district court erred by failing to issue a declaratory judgment that the 1998 contract and permit require GT Management to comply with any future KDHE directive ordering South Mulberry to address the off-site waste. South Mulberry wants to use the declaratory judgment solely to shift potential future responsibility for clean-up of off-site waste to GT. The district court thoroughly analyzed the contract and applicable KDHE regulations and determined that neither obligated GT to be responsible for clean-up of off-site waste created by a previous landfill owner. We affirm the district court's denial of the declaratory judgment but for reasons other than those articulated by the court. See *Price v. Simmons*, 31 Kan. App. 2d 631, Syl. ¶ 4, 71 P.3d 1164 (2002) ("A judgment of the district court may be affirmed on appeal if it was right for any reason.").

A court may enter a declaratory judgment declaring "rights, status, and other legal relations." K.S.A. 60-1701; see also K.S.A. 60-1704 (party may seek court order interpreting and declaring contract rights); K.S.A. 60-1705 (court may act if actual or threatened breach of contract). However, a declaratory judgment must also involve an actual case or controversy. *Solomon v. State*, 303 Kan. 512, 520, 364 P.3d 536 (2015). This requires a claim to be ripe for adjudication. 303 Kan. at 521. As an element of a

14

court's subject-matter jurisdiction, a party or the court may raise ripeness concerns at any time. *KNEA v. State*, 305 Kan. 739, 743, 387 P.3d 795 (2017).

Ripeness prevents courts from prematurely adjudicating disputes. 305 Kan. at 748. To be ripe, an issue must have taken shape and be concrete. 305 Kan. at 748; see *Solomon*, 303 Kan. at 521 (a claim must have "taken fixed and final shape rather than remaining nebulous and contingent"); *Woolums v. Simonsen*, 214 Kan. 722, Syl. ¶ 5, 522 P.2d 1321 (1974) (unless necessary to determine a present right, courts will not decide matters that are future, contingent, or uncertain). A claim is ripe when "'no additional facts need to arise or be developed on the record.'" *KNEA*, 305 Kan. at 748 (quoting *Solomon*, 303 Kan. at 522).

South Mulberry seeks to shield itself from liability in any future KDHE action to avoid an obligation that the KDHE has not yet imposed—and might never impose. We find the issue is not ripe and affirm the district court's denial of South Mulberry's request for declaratory relief.

Affirmed in part, reversed in part, and remanded.